# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

CARLOS RAY NORRIS,       )
a/k/a CHUCK NORRIS, an individual,  )     Civil Action No.  07 CV 11480 (RWS)
                               )
      Plaintiff,          )
                               )
v.                                 )
                               )
PENGUIN GROUP (USA), INC.,    )
a Delaware corporation,          )
IAN SPECTOR, an individual. and  )
QUBEFACTOR, INC., a New York   )
Corporation, d/b/a QUBEFACTOR   )
TECHNOLOGIES,              )
                               )
Defendants.           )
                               )

---

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF HIS
## MOTION FOR A PRELIMINARY INJUNCTION

---

Anthony J. Laura (AL-3091)
PATTON BOGGS LLP
1675 Broadway, 31st Floor
New York, NY 10019-5820
(646) 557-5100

Deborah M. Lodge (DL-8774)
PATTON BOGGS LLP
2550 M Street NW
Washington, D.C.  20037
202-457-6000

Attorneys for Plaintiff

TABLE OF CONTENTS

PRELIMINARY STATEMENT                                                          1

I.    FACTUAL BACKGROUND                                                       3

      A.    CHUCK NORRIS IS A WELL-KNOWN CELEBRITY WHOSE
            IDENTITY COMMANDS SIGNIFICANT COMMERCIAL VALUE.                     3

      B.    THE CHUCK NORRIS "FACTS" DRAW ON CHUCK NORRIS'S
            CELEBRITY STATUS.                                                   5

            1.    Introduction to Celebrity "Facts" Phenomenon                  5

            2.    Chuck Norris Does Not Object to Non-Commercial Uses
                  of the "Facts"                                               6

            3.    Defendants Did Not Seek Mr. Norris's Consent to Use His Name and
                  Image in Their Book                                          6

      C.    DEFENDANTS' BOOK BLATANTLY ABUSES CHUCK NORRIS'S
            IDENTITY FOR COMMERCIAL PROFIT.                                     7

            1.    Penguin Rejected Mr. Norris's Infringement Claims; Mr. Spector
                  Simply Ignored Them                                          8

            2.    Defendants' Book Threatens to Tarnish Mr. Norris's Reputation
                  and Interferes with His Ability to Control His Personal and
                  Professional Identity                                        9

II.   LEGAL STANDARD                                                          10

III.  ARGUMENT                                                                11

      A.    CHUCK NORRIS IS LIKELY TO PREVAIL ON THE MERITS OF HIS
            CLAIMS AGAINST DEFENDANTS.                                         11

            1.    Defendants Are Violating Lanham Act Section 43(a) by
                  Making False and Misleading Statements that Chuck
                  Norris Approves or Endorses their Book                       12

            2.    Defendants Are Infringing Mr. Norris's Right of Publicity    14

            3.    Defendants Are Infringing Mr. Norris's Trademarks.           15

            4.    Defendants are Diluting the "Chuck Norris" Mark.             18

5.    Defendants QubeFactor and Spector Are Cybersquatting by Using Mr. Norris's Name and Mark in Domain Names without Consent ....... 19

6.    Defendants Cannot Avail Themselves of a First Amendment or Parody Defense ....... 20

B.    SUFFICIENTLY SERIOUS QUESTIONS AS TO THE MERITS WARRANT INJUNCTIVE RELIEF. ....... 24

C.    MR. NORRIS WILL SUFFER IRREPARABLE HARM WITHOUT A PRELIMINARY INJUNCTION. ....... 24

IV.    CONCLUSION ....... 25

## PRELIMINARY STATEMENT

Plaintiff Carlos Ray Norris, better known as "Chuck Norris", seeks preliminary injunctive relief to stop Defendants Penguin Group (USA) Inc. ("Penguin"), Ian Spector ("Mr. Spector"), and QubeFactor Technologies ("QubeFactor") from their deliberate and unauthorized commercial exploitation and tarnishment of Plaintiff's famous name, trademarks and likeness. Defendants have usurped the famous "Chuck Norris" name and image, without consent, to Mr. Norris's immediate and irreparable harm. The facts supporting Plaintiff's motion are set forth in the accompanying sworn declarations of Plaintiff Carlos Ray Norris, Michael Kessler and Deborah Lodge, and the exhibits thereto.

On November 29, 2007, Defendant Penguin, through its Gotham Books Division, published a book entitled "The Truth About Chuck Norris" ("the Book"). The Book is not the "truth" about Mr. Norris; it is neither biographical nor factual. Rather, it consists of selected fabricated tall-tales featuring Chuck Norris. Thousands of these tall-tales, known as "facts", have been widely circulated on the Internet. These have also been posted on Defendant Ian Spector's Website, which is hosted by Defendant QubeFactor, a Website Hosting company owned or controlled by Mr. Spector. QubeFactor registered and is using two domain names featuring Chuck Norris's trademarked name -- "truthaboutchucknorris.com" and "truthaboutchuck.com" -- to link to a webpage on QubeFactor's www.4q.cc Website that promotes the Book.

Some of the "facts" in the Book are amusing. But many are racist; feature sexual promiscuity; or otherwise depict Mr. Norris in crude scenarios that conflict with his values. The Book falsely suggests that Chuck Norris approves of it and participated in its preparation. For example, the Preface refers to meetings between Defendant Spector and Mr. Norris, and the Acknowledgements page thanks Plaintiff "for playing along." In fact, Mr. Norris never

consented to Defendants' use of his name or likeness; Mr. Norris had no control or input over Defendants' use of his identity, or over Defendants' linking his name and likeness to unsavory, illegal, and vulgar images for their commercial purposes.

On December 7, 2007, Plaintiff discovered that Defendants had also begun using Mr. Norris's name and likeness in a video commercial, posted on the popular YouTube Internet website, which uses crude drawings of Mr. Norris to promote sales of the Book.

Mr. Norris has worked hard to create the value embodied in his name and persona, and to build the trust and loyalty of the public. Defendants have deliberately wrest from Mr. Norris his right to control the commercial use of his name and image. Defendants' actions threaten the integrity and value of Plaintiff's identity. Defendants are also pre-empting Mr. Norris's ability to license others to use his name and image for approved purposes, including for "authorized" versions of humorous Chuck Norris "facts".

Defendants' unauthorized commercial use of Mr. Norris's name and likeness, the Book's misleading representations, and the "cybersquatting" Domain Names violate Mr. Norris's trademark and other rights under Sections 32, 43(a), (c) and (d) of the Lanham Act, 15 U.S.C. §§ 1114, 1125(a), (c) and (d); violate his privacy and publicity rights under New York and Texas law; and also constitute unfair competition, dilution, and unjust enrichment under New York law. While First Amendment rights are broad, they do not protect Defendant's misappropriation of Chuck Norris's name and image, misleading and deceptive representations, or tarnishment of the "Chuck Norris" trademarks and goodwill.

Accordingly, Mr. Norris requests that this Court issue a preliminary injunction pending the resolution of these claims, requiring that: (1) Defendants desist from further sales, distribution or advertising of the Book; (2) Defendants desist from further false, misleading or

deceptive statements concerning Plaintiff or his endorsement of, approval of, or participation in the Book; (3)  Defendants desist from any further use of the Domain Names, or any other unauthorized uses of Mr. Norris's name, trademarks, or likeness for or in connection with any commercial endeavors;  (4) Defendants recall all unsold Books distributed to retailers or wholesalers; and (5) Defendants deliver to the Court or other secure place all unsold copies of the Book pending resolution of Plaintiff's claims.

Without such relief, Defendants will continue to abuse, dilute, and misappropriate Chuck Norris's famous name and image, to Chuck Norris's continuing irreparable and incalculable harm.

## I. FACTUAL BACKGROUND

### A. Chuck Norris is a Well-Known Celebrity Whose Identity Commands Significant Commercial Value.

Chuck Norris is a well-known celebrity.  He has achieved public recognition first as a martial arts instructor, and later as an actor, humanitarian, and celebrity.  He has starred in over twenty films, including *Missing in Action* and *The Delta Force*, and played the leading role in the popular television show *Walker, Texas Ranger*.  Prior to his movie career, Mr. Norris was a successful martial arts specialist and instructor, and a six-time undefeated World Professional Middleweight Karate Champion.  In 1997, he was awarded an 8th degree Black Belt Grand Master recognition in the Tae Kwon Do system.  He founded the United Fighting Arts Federation, and now sponsors the World Combat League, a competitive professional martial arts fighting league.  Declaration of Carlos Ray Norris ("Norris Decl.") at ¶ 1; Exs. 1 and 2 to Declaration of Michael G. Kessler ("Kessler Decl.").

Mr. Norris also is an accomplished author; he has published numerous books, both non-fiction (*e.g.* "Against All Odds" and 1998 New York Times Bestseller "The Secret of Inner

Strength," autobiography) and fiction ("A Threat to Justice" and other "Justice Rider" novels). Mr. Norris also writes a column for an Internet publication, World Net Daily. Norris Decl. at ¶ 5.

As a result of his accomplishments, Mr. Norris has achieved widespread recognition and renown. He has been described as an "[a]ction-man, family man, religious man, movie star, television producer, internet super-hero, sports star and humanitarian." Kessler Decl. at ¶ 5. He is often perceived as an embodiment of the all-American success story, and as an example of the rewards of hard work, honesty, and integrity. *Id.* at ¶¶ 6, 7 and Exs. 2 and 5 thereto. Mr. Norris's credibility and honor are important to him. Norris Decl. at ¶¶ 6, 9, and 19.

As a result of his efforts and renown, Mr. Norris has generated significant goodwill in his name and image, which have also attained significant commercial value. Norris Decl. at ¶ 8. Mr. Norris licenses certain uses of his name and identity for use with numerous products – including t-shirts, hats, mugs, and posters. Norris Decl. at ¶ 8. Mr. Norris also serves as a product spokesman, including for the Total Gym product. *Id.* Mr. Norris has generated significant revenues from these licenses and product endorsements. *Id.*

Mr. Norris closely governs the use of his name and identity through licensing programs, in part to preserve positive associations with his name and to restrict abuse. Before endorsing a product, Mr. Norris reviews it to ensure that it meets his standards. *Id.* at ¶¶ 6-7. Mr. Norris also selectively authorizes these marks to be used in certain instances, and on certain products or websites. *Id.* at ¶ 8. Mr. Norris owns numerous registered and common law trademarks, in the United States and elsewhere, along with the goodwill symbolized by such marks (the "Norris Marks"). Norris Decl. at ¶ 7. "Chuck Norris" is a famous mark registered at the United States Patent and Trademark Office and is readily associated with Mr. Norris. *See id.* at ¶ 7; Kessler Decl. at ¶ 5.

Mr. Norris uses his celebrity status to endorse humanitarian causes. He has served as a spokesperson for the Veterans Administration. Norris Decl. at ¶ 4. Mr. Norris also launched a successful program, KickStart, which teaches martial arts to at-risk children as part of their school curriculum to help raise their self-esteem and instill discipline and respect for themselves and others. *Id.* at ¶ 3. Through his website, at chucknorris.com, and public activities—including visits to the U.S. troops fighting in Iraq and efforts for the non-profit KickStart Program—Mr. Norris continues his outreach to fans and his commitment to patriotism, justice and honor.

**B. The Chuck Norris "Facts" Draw On Chuck Norris's Celebrity Status.**

*1. Introduction to Celebrity "Facts" Phenomenon*

The Chuck Norris "facts" are part of an Internet pop culture phenomenon, in which Internet users circulate untrue statements, dubbed "facts," about different celebrities. Some examples of Chuck Norris "facts" are:

> "Chuck Norris's tears cure cancer. Too bad he has never cried."
> "Chuck Norris does not sleep. He waits."
> "Chuck Norris *can* divide by zero."

There are hundreds, if not thousands, of Chuck Norris "facts" on the Internet that associate Chuck Norris's celebrity image with super-human and fantastical abilities. Norris Decl at ¶ 11; Kessler Decl. at ¶ 10. In addition to Chuck Norris, "facts" about celebrities such as Vin Diesel, Mr. T, , Bob Saget, and others, have circulated on the Internet. Kessler Decl. at ¶ 6; and Exs. 8, 9, 10 thereto. These "facts" are derived as a collaborative effort through many anonymous and disparate Internet users and are widely circulated through chat rooms, email, and posted on Websites, including the QubeFactor website at www.4q.cc. Kessler Decl. at ¶ 10.

*2. Chuck Norris Does Not Object to Non-Commercial Uses of the "Facts"*

In general, Mr. Norris has not objected to non-commercial uses of these "facts." He is aware of the Chuck Norris "facts" phenomenon and has found many of the "facts" humorous.

Norris Decl. at ¶ 11. Mr. Norris appeared in a commercial for Mountain Dew that humorously spoofs this phenomenon. *Id.* at ¶ 13. Mr. Norris controls the authorized "Chuck Norris Facts" website, chucknorrisfacts.com, which promotes sales of "Chuck Norris" t-shirts sold by an approved licensee. *Id.* at ¶ 13. Mr. Norris owns registered trademarks for "Chuck Norris Facts" marks (U.S. Reg. Nos. 3220185 and 3213519). *Id.* at ¶ 7 and Ex. 2 thereto. Mr. Norris has not objected to "facts" websites so long as they do not sell unauthorized "Chuck Norris" merchandise or tarnish his image by association with vulgarity. Norris Decl. at ¶ 12.

### 3. Defendants Did Not Seek Mr. Norris's Consent to Use His Name and Image in Their Book

Defendants did not ask Mr. Norris for his consent, although they had ample opportunity to do so. Norris Decl. at ¶ 17. In January 2006 Mr. Spector met Mr. Norris, who acknowledged the Internet "facts" phenomenon. Mr. Norris was not asked for his consent, nor did he give Mr. Spector his consent to use his name and image in a book or for any commercial purpose. Norris Decl. at ¶ 17. Despite that, the Book misleadingly "thanks" Mr. Norris "for playing along" and suggests that Mr. Norris met with Mr. Spector for purposes of collaborating on the Book. *See* Declaration of Deborah M. Lodge ("Lodge Decl."), Ex. 1, pp. ix-x, 161 of Book.

Mr. Spector, QubeFactor, and Penguin all are aware of Mr. Norris's rights; the QubeFactor Website even has a disclaimer acknowledging that each "fact" celebrity's trademark and other rights belong to the celebrity. Kessler Decl. ¶ 6. Despite those acknowledgements, QubeFactor and Mr. Spector registered and are using Mr. Norris's name in the Domain Names ("truthaboutchucknorris.com" and "truthaboutchuck.com"), without Mr. Norris's consent. Those Domain Names resolve to the QubeFactor website at 4q.cc, where "The Truth About Chuck Norris" is shamelessly promoted as "slampacked with 20 illustrations and 400 hard-hitting, unapologetic facts about the world's greatest martial arts master and Texas Ranger!" See Kessler Decl., Exh. 13.

**C. Defendants' Book Blatantly Abuses Chuck Norris's Identity for Commercial Profit.**

Gotham Books, a non-fiction Division of Penguin, published "The Truth About Chuck Norris" on November 29, 2007.  The Book's cover displays Mr. Norris's trademarked name ("Chuck Norris") in large font along with a recognizable drawing of Mr. Norris.  *See* Ex. 1 to Declaration of Deborah M. Lodge ("Lodge Decl.").  The Book's title is false – the Book does not contain the "truth" about Mr. Norris; it is not a biography, or even a fictionalized account of Mr. Norris's life.  Instead, the Book is an illustrated compendium of Chuck Norris "facts," many of which apparently were authored by Internet users and previously published on the Internet.

Some of the facts are humorous.  Others, however, are crude and threaten Chuck Norris's credibility and goodwill.  For instance, numerous  "facts" in the Book associate Mr. Norris with violent acts (*e.g.* "Chuck Norris once ripped a man in half just to see what he had for lunch"), racism (*e.g.* "Chuck Norris lives by one rule: no Asian chicks"), sexual promiscuity (*e.g.* "somewhere, right now, Chuck Norris is plowing a woman he doesn't love"), or illegal activities (*e.g.* "Chuck Norris likes his girls like he likes his whiskey – twelve years old and mixed up with coke").  See Lodge Decl., Exhibit 1.

The Book's illustrations depict Mr. Norris engaged in violent and sexual activities.  For example, one picture shows Mr. Norris with a gun in front of a row of emaciated, starving children, presumably cancer patients.  The accompanying "fact" states: "Chuck Norris's tears cure cancer.  Too bad he has never cried."  *Id.*  Another illustration shows a likeness of Mr. Norris engaging in lewd behavior with a woman with the following "fact:"  "Chuck Norris once ate three seventy-two-ounce steaks in one hour.  He spent the first forty-five minutes of that hour having sex with his waitress."  *Id.*  Some reviews of the Book posted on Amazon.com and other Websites show dismay over the "nearly pornographic" illustrations and the "…number of

offensive and sexual jokes" linked to Mr. Norris's name; one reviewer stated it was "[n]ot what I expected". Kessler Decl. at ¶ 8 and Exhibit 6 attached thereto.

Mr. Spector has suggested that Defendants intentionally emphasized the vulgar facts to improve the Book's commercial sales. In a November 2007 interview published in the "Brown Daily Herald", Mr. Spector commented: "I knew I didn't want to include too many vulgar things involving genitalia and infants … Anything that is really vulgar or hard-core probably wasn't approved by me. But if that's what they [Penguin/Gotham Books] think will sell, it's fine by me." Lodge Decl. at Exhibit 4.

These unsavory statements and illustrations conflict with Mr. Norris's public image and personal values. Norris Decl. at ¶¶ 15, 16; Kessler Decl. at ¶¶ 5, 7. The Book's cover has no disclaimer to warn consumers about the lurid content, a point mentioned by one disappointed consumer. Kessler Decl. at ¶ 8. The Book does not disclaim affiliation with Mr. Norris. To the contrary, the Book's Preface recounts Mr. Spector's meetings with Mr. Norris and falsely states that Mr. Spector "is still in touch" with Mr. Norris and his wife, Gena. Lodge Decl. at Exh. 1, Book, pp. x-xi. The Afterward implies that Mr. Norris endorses the Book: "And [thanks] of course to Chuck: You've got an awesome sense of humor. Thanks for playing along." *Id.*, p. 161.

*1. Penguin Rejected Mr. Norris's Infringement Claims; Mr. Spector Simply Ignored Them.*

Defendants' claim that Mr. Norris is "playing along" with their blatant commercial exploitation of his name and likeness reveals their contempt for Mr. Norris's rights. Neither Penguin nor Mr. Spector sought Mr. Norris's approval before exploiting his identity in the Book – although Penguin and Mr. Spector knew of Mr. Norris's rights and had time to seek Mr. Norris's consent for their Book. That they did not do so suggests that they proceeded in bad faith because they believed that he would not approve the Book. Norris Decl. at ¶ 18.

After learning of the proposed Book, Mr. Norris's attorneys sent Defendants Penguin/Gotham and Mr. Spector a "cease and desist" letter on October 24, 2007, before publication. The letter warned Defendants that the Book and the truthaboutchucknorris.com domain name violated Mr. Norris's trademark, publicity rights, and other rights. Mr. Spector never responded to Mr. Norris's letter. Penguin responded on October 26, 2007, and, without denying Mr. Norris's claims, asserted that the First Amendment protected its conduct. On November 16, 2007, Mr. Norris's attorneys requested that Penguin reconsider after pointing out to them that the First Amendment does not protect Defendants' commercial abuse of Mr. Norris's identity. They also requested an advance copy of the Book, to enable Mr. Norris to review it prior to publication. Penguin refused those requests. A copy of this correspondence is attached as Exhibits 2-5 to the Lodge Decl. Defendants' flat disregard of Mr. Norris's rights, and their brazen publication and advertising (including the new YouTube commercial, Kessler Decl. at ¶ 12, Exh. 3), constitute willful and intentional infringement of Mr. Norris's rights.

*2. Defendants' Book Threatens to Tarnish Mr. Norris's Reputation and Interferes with His Ability to Control His Personal and Professional Identity*

Penguin and Mr. Spector decided which of the thousands of "facts" -- including "vulgar" or "hard core" facts –should be selected for commercial exploitation without consulting Mr. Norris. Despite that, the Book suggests that Mr. Norris approved of the Book's unsavory portrayals of him and thanks him for "playing along." *See* Lodge Decl., Exhibit 1.

Defendants' misappropriation of Mr. Norris's name, likeness, and persona may well alienate Mr. Norris's existing licensees and impair his relations with prospective licensees and business opportunities. Norris Decl. at ¶¶ 20-21. Defendants are also pre-empting Mr. Norris's ability to license others to use his name and image for approved purposes, including for "authorized" versions of humorous Chuck Norris "facts". *Id.* Further, other unscrupulous

9

merchandisers may try to misuse the "Chuck Norris" name and marks in other unapproved co. *Id.* They may be encouraged to do so by Defendants' behavior, if it is not stopped. Moreover, Defendants' Book is advertised alongside books authored by Plaintiff, on such websites as amazon.com. Kessler Decl. at ¶ 7 and Exhibit 4 thereto. Plaintiff's legitimate books are thus competing for sales and consumer attention with Defendants' unauthorized Book. Unless halted, Defendants' unauthorized actions will severely harm Mr. Norris's interests and will no doubt increase the costs for Mr. Norris to enforce his right to control the use of his identity. Norris Decl. at ¶ 20.

Defendants' abuse of Mr. Norris's name and image in connection with illicit and unsavory "facts" will also likely tarnish his reputation. Consumers have already criticized the Book as "offensive" and "sacrilegious" – see Kessler Decl. at ¶ 8 -- traits that are repugnant to Mr. Norris and his honorable image. As Mr. Norris stated: "I have tried to entertain with a moral: that right-minded people stand up for themselves and respect the rights of others. Defendants are misusing my identity and my good-natured support of the non-commercial "facts" phenomenon for their own profit." Norris Decl. at ¶ 22. Mr. Norris has not only built his life on a foundation of strong values and beliefs, but he also endorses organizations such as KickStart that are designed to instill positive values and self-esteem in those most in need of it. His credibility is being undermined by Defendants' exploitation of his name and persona.

## II. LEGAL STANDARD

To obtain a preliminary injunction in the Second Circuit, a party must establish two separate components: "(1) that [plaintiff] will be irreparably harmed if an injunction is not granted, and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation, and a balance of the hardships tipping decidedly in its favor." *Lusk v. Village of Cold Spring*, 475 F.3d 480, 485 (2d

Cir. 2007). Irreparable harm exists where, but for the preliminary injunction, it would be difficult or impossible to return the parties to the positions they previously occupied. *Ptak Bros. Jewelry, Inc. v. Ptak*, No. 06-13732, 2007 WL 1536934, at *5 (S.D.N.Y. May 29, 2007).

The Court often presumes a likelihood of success on the merits and irreparable harm where the plaintiff makes "a showing of likelihood of [trademark] confusion" under the Lanham Act, assuming that plaintiff has a protectable mark. *Ahava (USA), Inc. v. J.W.G. Ltd.*, 250 F. Supp. 2d 366, 369 (S.D.N.Y. 2003); *see also Hasbro, Inc. v. Lanard Toys, Ltd.*, 858 F.2d 70, 73 (2d Cir. 1988) ("In a Lanham Act case a showing of likelihood of confusion establishes both a likelihood of success on the merits and irreparable harm.").

### III. ARGUMENT

**A. Chuck Norris is Likely to Prevail on the Merits of His Claims against Defendants.**

Defendants' Book is likely to confuse and mislead members of the public into believing that the Book was authorized, endorsed, or approved by Mr. Norris. Defendants also are blatantly violating Mr. Norris's intellectual property rights, including his trademark rights and his right to control his name and commercial identity. The Book is a clear competitive commercial exploitation of Mr. Norris's name and likeness that misleads the public and tarnishes Mr. Norris's image. It is not subject to First Amendment or other "fair use" protections. Accordingly, as shown below, Mr. Norris is likely to succeed on the merits of his claims.

**1. Defendants Are Violating Lanham Act Section 43(a) by Making False and Misleading Statements that Chuck Norris Approves or Endorses their Book**

Mr. Norris is likely to prevail on his claims that Defendants are violating Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), due to their false or misleading representations that he endorsed or approves of the Book. Section 43(a) prohibits the marketing a product in a manner that is likely to mislead consumers into believing the product is sponsored or approved by another person when it is not. *See, e.g. Rostropovich v. Koch Int'l Corp.*, 34 U.S.P.Q.2D (BNA) 1609, 1612 (S.D.N.Y. 1995); *Allen v. National Video, Inc.*, 610 F.Supp. 612, 625-26 (S.D.N.Y. 1985) (a celebrity's persona merits protection under Section 43(a)). To prevail on a false endorsement claim, a plaintiff must show that "(1) goods or services were involved, (2) there was an effect on interstate commerce, and (3) there was either a false designation of origin or a false description of goods and services." *Pelton v. Rexall Sundown, Inc.*, No. 99 Civ. 4342, 2001 WL 327164, at *3 (S.D.N.Y. Apr. 4, 2001).

The first two prongs are easily satisfied here: Defendants are using Mr. Norris's name and likeness in connection with a Book sold in interstate commerce. The third prong is satisfied because statements in the Book represent that Mr. Norris approved of the Book: the "acknowledgment" portion thanks Mr. Norris "for playing along;" the preface states that Mr. Spector "…is still in touch with Chuck…" Norris Decl. at ¶ 17. These are "literal falsehoods" prohibited under the plain language of Section 43(a).

Section 43(a) also prohibits "innuendo, indirect intimations and ambiguous suggestions." *American Home Prods. Corp. v. Johnson & Johnson,* 577 F.2d 160, 165 (2d Cir. 1978). The Book's prominent use of Mr. Norris's name and likeness suggests that Mr. Norris consented to this use of his image and name, because the idea that a publisher such as Penguin would recklessly proceed without obtaining consent contravenes common sense and commercial

12

practices. *See, e.g. Grant v. Esquire, Inc.*, 367 F. Supp. 876, 883 (S.D.N.Y. 1973) ("If the publisher feels impelled to trade upon the name and reputation of a celebrity, it must pay the going rate for such benefit."). The use of Mr. Norris's image on the spine and cover increases the likelihood that consumers will believe that Mr. Norris endorsed or approves of the Book. *See Twin Peaks Prods. v. Publ'ns Int'l, Ltd.*, 996 F.2d 1366, 1380 (2d Cir. 1993) (noting that "[i]t is a fair question whether a title that might otherwise be permissible under *Rogers* violates the Lanham Act when displayed in a manner that conjures up a visual image prominently associated with the work bearing the mark that was copied.").

Second, Mr. Norris's own ChuckNorrisFacts.com website and his acknowledgement of the Internet "facts" phenomenon heighten the likelihood that consumers will be misled into believing that Mr. Norris endorses this "facts" Book. No disclaimers in the advertising or on the Book are used to obviate that confusion. In other cases, such as *Cliffs Notes, Inc. v. Bantam Doubleday Dell Pub. Group*, 886 F.2d 490, 493 (2nd Cir. 1989), the courts found prominent disclaimers helped to defuse such confusion. See also *Hoffman v. Capital Cities/ABC, Inc.*, 255 F.3d 1180, 1188 (9th Cir. 2001).

Consumer comments already show confusion, and either belief that Mr. Norris had approved the Book, or disbelief that the Book was published without Mr. Norris's consent. See Kessler Decl. ¶ 15, Exh. 17 (comments about Book posted on 4q.cc website; example: "Jokes are one thing, but publishing untrue things about him without his permission?"). See also Lodge Decl. ¶¶ 9-10, Exh. 6 thereto (examples from fan letters received at chucknorris.com: "I was shocked with the vulgarity that was used even thou [sic] they said you approved it...." "I'm glad that you are suing those people who have been misrepresenting your image..."). The public is being confused and misled by Defendants' misrepresentations due to the false title of the Book,

13

the unauthorized use of Chuck Norris's name and image, and from the false statements about Chuck Norris's affiliation and approval of the Book.

## 2. Defendants Are Infringing Mr. Norris's Right of Publicity

In the Second Circuit, law of the plaintiff's domicile governs right of publicity claims. *Rostropovich,* 34 U.S.P.Q.2d at 1616 (citing *Rogers v. Grimaldi,* 875 F.2d 994, 1002 (2d Cir. 1989)). Thus, Texas law applies to Mr. Norris's claim for infringement of his right of publicity. Texas recognizes this publicity right under its common law tort of misappropriation. *Brown v. Ames,* 201 F.3d 654, 657 (5th Cir. 1994) ("In Texas, the tort of misappropriation provides protection from the unauthorized appropriation of one's name, image or likeness"); *Henley v. Dillard Dep't Stores*, 46 F. Supp. 2d 587, 590 (N.D. Tex. 1999) ("The tort of misappropriation of one's name or likeness is generally referred to as the 'Right of Publicity . . .'")

Texas law clearly recognizes that "celebrities have an exclusive legal right to control and profit from the commercial use of their name, personality and identity." *Id.* at 590. To recover for the misappropriation of name and likeness in Texas, a plaintiff must prove: "(1) the defendant appropriated the plaintiff's name or likeness for the value associated with it, and not in an incidental manner or for a newsworthy purpose; (2) the plaintiff can be identified from the publication; and (3) there was some advantage or benefit to the defendant." *Id.* (citing *Matthews v. Wozencraft,* 15 F.3d 432, 437 (5th Cir. 1994)).

Mr. Norris easily satisfies these three factors. First, Defendants' Book "The Truth About Chuck Norris", Domain Name, and advertising (including the cartoon "The Ballad of Chuck Norris") prominently features Chuck Norris's name and likeness in a non- "incidental" fashion. Chuck Norris "is reasonably identifiable to more than a *de minimus* number of persons." *Id* at 595. Defendants cannot reasonably argue otherwise.

14

Defendants appropriated Chuck Norris's identity for the value associated with it – they could easily have chosen another celebrity or a fictional character to serve as a vehicle for their "facts" Book.  As the Book is pure fiction, no "newsworthy" exception can apply.  *See Lowe v. Hearst Communs., Inc.*, 487 F.3d 246, 250 (5th Cir. 2007) (test for "newsworthiness" is the same under Texas law as under federal constitutional law); *Solano v. Playgirl, Inc.* 292 F.3d 1078, 1089 (9th Cir. 2002) ("[N]ewsworthiness privileges do not apply where a defendant uses a plaintiff's name and likeness in a knowingly false manner to increase sales of the publication.  The First Amendment does not protect knowingly false speech.").

Defendants gained the benefit of a celebrity endorsement without having to pay for it. *Henley*, 46 F. Supp. 2d at 597.  ("By appropriating Plaintiff's name or likeness, Defendant received the benefit of a celebrity endorsement without asking permission or paying a fee.").  Thus, Mr. Norris is likely to prevail on claims of infringement of his publicity rights.

**3. Defendants Are Infringing Mr. Norris's Trademarks.**

Mr. Norris is also likely to prevail on his claim that Defendants are infringing his trademarks.  To show trademark infringement under Sections 32 and 43(a) of the Lanham Act, a plaintiff must establish:  (1) that it has a valid mark that is entitled to protection of the law, and (2) the defendants' actions are likely to confuse the public as to the origin of the products in question. 15 U.S.C. §§ 1114(1)(a), 1125(a); *The Echo Design Group v. Zino Davidoff S.A.*, 283 F. Supp. 2d 963, 966 (S.D.N.Y. 2003) (citation omitted); *Clinique Laboratories, Inc. v. Dep Corp.*, 945 F. Supp. 547, 550 (S.D.N.Y. 1996).  Both requirements are satisfied here.

*a. Mr. Norris Owns Valid "Chuck Norris" Trademarks*

Mr. Norris owns several "Chuck Norris" federal trademark registrations, including U.S. Reg. Nos. 2,124,757 and 2,864,474.  The "Chuck Norris" name is famous and distinctive.  Mr. Norris has invested considerable time and money in protecting and promoting the goodwill

15

symbolized by the Norris Marks.  Norris Decl. *at* ¶ 9.  Chuck Norris's "likeness" is also considered a "mark" for purposes Section 43(a).  *See, e.g. Dorsey v. Black Pearl Books, Inc.* 06-Civ.02948, 2006 WL 3327874, *6 (D. N.J. Nov. 14, 2006) and cases cited therein.  Mr. Norris thus owns valid trademark rights in his name and likeness.

*b. Defendants' Use of the Norris Marks is Likely to Confuse, Mislead, or Deceive Consumers*

In the Second Circuit, likelihood of confusion often is measured by eight *Polaroid* factors: (1) the strength of plaintiff's mark; (2) the similarity between the two marks; (3) the proximity of the products in the marketplace; (4) the likelihood that the prior owner would bridge the gap between products; (5) evidence of actual confusion; (6) defendant's bad faith; (7) the quality of defendant's product; and (8) the sophistication of the relevant consumer group. *Polaroid Corp. v. Polarad Elec. Corp.,* 287 F.2d 492, 495 (2d Cir.), *cert. denied,* 368 U.S. 820 (1961); *Echo Design Group,* 283 F.Supp 2d at 966.   In this case, parody is an additional factor in the analysis.  *See Hormel Foods Corp. v. Jim Henson Prods., Inc.,* 73 F.3d 497, 503 (2d Cir. 1996).

Mr. Norris easily meets the *Polaroid* factors.  "Chuck Norris" is a famous, distinctive mark.  The identical "Chuck Norris" mark is used in connection with the Book and as part of the Domain Names.  This thus is not a "parody" situation where spoofs of names are used.  *Compare Abdul-Jabbar v. General Motors Corporation* 85 F.3d 407, 416 (9th Cir. 1996) (noting viability of Lanham Act and California publicity law claims where celebrity's actual name used in advertising) *with Cardtoons, L.C. v. Major League Baseball Players Ass'n,* 95 F.3d 959 (10th Cir. 1996) (parodic transformations of baseball players' names defused confusion), *and Winter v. D.C. Comics,* 69 P.3d 473 (2003) (changing names and images of musicians for use in comic book).  Overlap and confusion here is evident. It is demonstrated by advertising at Amazon.com

and elsewhere, where Mr. Norris's own books are displayed alongside the Book. *See* Kessler Decl. ¶ 7, Ex. 4 attached thereto. A successful author, Mr. Norris has already "bridged the gap" – he has prominently used his name and likeness on books he has written. Therefore the first five factors weigh in favor of finding a likelihood of confusion.

Bad faith may be inferred where, as here, Defendants have actual and constructive knowledge of the mark. *Paddington Corp. v. Attiki Imps. & Dists., Inc.*, 996 F.2d 577, 587 (2d Cir. 1993). Mr. Spector's Website acknowledges Mr. Norris's trademark rights. Penguin never denied Mr. Norris's substantial trademark rights. Further, bad faith may be inferred where, as here, Defendants are trading on the Norris Marks' recognition and goodwill to attract customers. *Courtenay Communs. Corp. v. Hall*, 2007 U.S. Dist. LEXIS 52847, *17-18 (S.D.N.Y. 2007).

The Book and video advertising are considered "inferior" quality products because their "vulgar" and "hard core" content are far beneath Mr. Norris's standards and could well tarnish or injure Mr. Norris's reputation. See *Nikon, Inc. v. IKON Corp.* 987 F.2d 91, 95 (2d Cir. 1993)

The consumer sophistication factor also favors likely confusion. Books, unlike houses or long-term investments, are relatively inexpensive; therefore, ordinary purchasers are unlikely to carefully examine whether Mr. Norris had licensed or endorsed the Book. *See Star Indus. v. Bacardi & Co.*, 412 F.3d 373, 390 (2d Cir. 2005) (relevant question is whether consumers are sophisticated enough to understand that Defendants are using trademark without a license). Defendants' use of the word "Truth" in the Book and Domain Name; the Book's "thanks" to Mr. Norris; the Book's references to meetings with Mr. Norris and his wife; the fact that retailers advertise the Book next to books written by Mr. Norris – all contribute to the likelihood that a consumer will not realize (until after the purchase perhaps, or until learning later of Mr. Norris's

17

disapproval), that Defendants were not licensed by Mr. Norris.  The eight *Polaroid* factors thus favor a finding of likely confusion and infringement.

### 4.  Defendants are Diluting the "Chuck Norris" Mark.

Mr. Norris also is likely to prevail on dilution claims under Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c), and New York General Business Law §360-L.  Dilution is "the lessening of the capacity of a famous mark to identify and distinguish goods or services, regardless of the presence or absence of -- (1) competition between the owner of the famous mark and other parties, or (2) likelihood of confusion, mistake, or deception." 15 U.S.C. § 1127. Similarly "[l]ikelihood of injury to business reputation or dilution of the distinctive quality of a mark or trade name" entitles Plaintiff to prevail on a state law dilution claim, "notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services." Gen. Bus. Law § 360-l.

A plaintiff asserting a Lanham Act dilution claim must establish that: "(1) its mark is famous; (2) the defendant is making commercial use of the mark in commerce; (3) the defendant's use began after the mark became famous; and (4) the defendant's use of the mark dilutes the quality of the mark by diminishing the capacity of the mark to identify and distinguish goods and services." *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 454 F.3d 108, 118 (2d Cir. 2006) (quotation omitted).  The New York statute provides essentially the same standard. *New York Stock Exch., Inc. v. New York, New York Hotel*, LLC, 293 F.3d 550, 557 (2d Cir. 2002).  Under New York law, a plaintiff must show (1) that it possesses a distinctive trademark, and (2) that defendants' use of those trademarks results in a likelihood of dilution. *Id.* 557-558.

Blurring occurs where defendants "use[] or modif[y] the plaintiff's trademark to identify the defendant's goods and services, raising the possibility that the mark will lose its ability to serve as a unique identifier of the plaintiff's product." *Deere & Co. v. MTD Prods.*, 41 F.3d 39,

43 (2d Cir. 1994) (emphasis in original). Defendants are blatantly attempting to connect the Norris Marks and Mr. Norris's known endorsement of the "facts" phenomenon with their own compilation of "facts". Their use of the Norris Marks and suggestions that Mr. Norris "is still in touch" with Mr. Spector incorrectly implies that Defendants are associated with Mr. Norris.

The Book's graphic images and language depicting Chuck Norris engaging in seamy activity and linking his name with violent, racist, or vulgar language and otherwise objectionable material reaches beyond a "harmless, clean pun." *Tommy Hilfiger Licensing, Inc. v. Nature Labs, LLC*, 221 F. Supp. 2d 410, 423 (S.D.N.Y. 2002) (citation omitted). Defendants have instead linked Mr. Norris's name and image to "an unwholesome or unsavory context likely to evoke unflattering thoughts" about Chuck Norris. *Deere & Co.*, 41 F.3d at 43. This alone establishes tarnishment. *Hormel*, 73 F.3d at 507 ("The *sina qua non* of tarnishment is a finding that plaintiff's mark will suffer negative associations through defendant's use."). Exhibit 6 to the Lodge Declaration annexes some of the unsolicited fan letters Mr. Norris received commenting on the Book and this suit. They show that Mr. Norris's reputation has already been tarnished by the Book.. Mr. Norris is thus likely to prevail on his dilution claims. Defendants' unauthorized use of the "Chuck Norris" marks is diluting and tarnishing the distinctiveness and integrity of those marks, to Mr. Norris's irreparable harm.

## 4. Defendants QubeFactor and Spector are Cybersquatting by Using Mr. Norris's Name and Mark in Domain Names without consent.

Mr. Norris is likely to prevail on the merits of his claim that QubeFactor and Mr. Spector are cybersquatting in violation of Section 43(d) of the Lanham Act, 15 U.S.C. § 1125(d). To prevail on a cybersquatting claim, a plaintiff must show: (1) that defendant registered a domain name that uses a mark that was "distinctive" or "famous" at the time the mark was registered; (2) that the Domain Names are identical, confusingly similar to, or dilutive of the famous "Chuck

Norris" mark; and (3) that defendant acted with a "bad faith intent to profit" from the mark.  15 U.S.C. § 1125(d)(1)(A)(i)-(ii);  *Storey v. Cello Holdings, L.L.C.*, 347 F.3d 370, 381 n.8 (2nd Cir. 2003).

Mr. Norris's "Chuck Norris" mark was "distinctive" or "famous" in May 2007 when QubeFactor registered the domain names truthaboutchucknorris.com and truthaboutchuck.com. As explained above, the Domain Names are both confusingly similar to and dilutive of the famous Norris Marks.  The Domain Names merely add the two words "truth" and "about" to Mr. Norris's mark and name. Consumers are likely to believe that the Domain Names link to a website with truthful information about Chuck Norris.  As shown above, Defendants QubeFactor and Spector acted with a bad faith intent to profit from the use of Mr. Norris's trademarked name.  Therefore, Mr. Norris is likely to prevail on the merits of his claim that those Defendants are cybersquatting in violation of 15 U.S.C. § 1125(d).

**5.  Defendants Cannot Avail Themselves of a First Amendment or Parody Defense.**

In response to Plaintiff's cease and desist letter, Penguin asserted that that the Book was protected as a parody and that the First Amendment "unqualifiedly protects" it "from legal claims of whatever character."  Ex. 3 to Lodge Decl.  "As forms of expression, humor and comedy have never been held to be entitled to absolute or categorical First Amendment protection." *Geary v. Goldstein,* 831 F. Supp. 269, 274 (S.D.N.Y. 1993) (citing *Frank v. National Broadcasting Co.*, 119 A.D.2d 252, 506 N.Y.S.2d 869, 872 (1986)); *see also Campbell v. Acuff-Rose Music, Inc.,* 510 U.S. 569 (1994) ("[S]uggestion that any parodic use is presumptively fair has no more justification in law or fact than the equally hopeful claim that any use for news reporting should be presumed fair.").  Defendants' violations of Mr. Norris's rights exceed the bounds of First Amendment protection, in part because (i) the Book is clearly a

commercial venture (not an "expressive work") that directly competes with Mr. Norris's own "facts" merchandise and books; (ii) the Book and Domain Name contain false and misleading statements not protected by the First Amendment; and (iii) the Book tarnishes Mr. Norris's trademarked name.

**a. Defendants' Profiteering Is Not Protectable "Parody"**

The First Amendment provides some protection to expressive artistic works, but it does not permit individuals to blatantly exploit celebrity identities for commercial purposes. *See, e.g. White v. Samsung Electronics America,* Inc., 971 F.2d 1395, 1401 (9th Cir. 1992) (robot look-alike of Vanna White was clearly a parody, but unlawful because it was used in a commercial sense to advertise a product); *Allen v. National Video, Inc.,* 610 F.Supp. 612, 625-26 (S.D.N.Y. 1985). Defendants here are not the original creators of an expressive work – they have merely copied humorous "facts" circulating on the Internet and published it as a Book. Ex. 1 to Lodge Decl.; Kessler Decl. at ¶ 6. This unoriginal regurgitation of others' contributions does not entitle Defendants to First Amendment protection. *Estate of Presley v. Russen,* 513 F. Supp. 1339, 1359-60 (D. N.J. 1981) ("entertainment that is merely a copy or imitation... does not really have its own creative component and does not have a significant value as pure entertainment").

As fictional work, the Book does not have the First Amendment protection afforded to recounts of historical events. *Compare Dorsey,* 2006 WL 3327874 (injunction and recall of defendant's fictional books ordered after unauthorized picture of plaintiff, a well-known celebrity, was featured on cover of books), *with ETW Corp v. Jireh Publishing, Inc.* 332 F.3d 915 (6th Cir. 2003) (finding painting depicting "Tiger" Woods at an historical event does not infringe upon his commercial rights). There is no transformation or clever play on Mr. Norris's name, as there was in *Cardtoons, L.C.* (transforming the names of baseball players) or in *Winter* (changing name and image of musicians for use in comic book).

Further, the entire purpose of the Book is to exploit Mr. Norris's name and persona; he is not merely a "bit part" in a larger work. Defendants' freely admit that their interest is in selling Books – when questioned about the lawsuit, Defendant Penguin did not express concerns over their First Amendment rights, but stated instead "I hope they sue. It will sell more books." Kessler Decl. at ¶ 9. Similarly, Defendant Spector has stated the selection of vulgar "facts" was driven by a what Penguin thought would "sell." Lodge Decl. at Exhibit 4. When this type of commercial exploitation of a competitor's trademark occurs, "not for worthy purposes of expression, but simply to sell products" the First Amendment will not protect a parody. *Deere & Co. v. MTD Prods.*, 41 F.3d 39, 44-45 (2d Cir. 1994).

Defendants also cannot claim a parody defense because they directly compete with Plaintiff for the sale of "facts" merchandise and for books in general. *See, e.g. Tommy Hilfiger Licensing, Inc. v. Nature Labs, LLC*, 221 F. Supp. 2d 410, 418 (S.D.N.Y. 2002). Defendants cannot evade responsibility for misappropriating Plaintiff's intellectual property merely by characterizing the work as a "parody."

**b. Defendants' Misleading and False Speech is Not Protected by the First Amendment**

The First Amendment does not guarantee Defendants the right to publish material that violates Mr. Norris's rights and misleads the public. *See, e.g. Spahn v. Julian Messner, Inc.*, 21 N.Y.2d 124 (1967) (fictional work depicting celebrity as a "larger than life" hero not protected by the First Amendment). As the Second Circuit stated: "poetic license is not without limits. The purchaser of a book, like the purchaser of a can of peas, has a right not to be misled as to the source of the product." *Rogers v. Grimaldi*, 875 F.2d 994, 997 (2d Cir. 1989). The Book's title "Truth About Chuck Norris" and Domain Name are explicitly misleading and are not subject to First Amendment protection. *Id.* at 1000; Kessler Decl. at ¶ 13 (noting newspaper articles

reporting that Defendants' Book is a "biography" of Chuck Norris). The Book's advertising is also likely to confuse the public as to Mr. Norris's association with the Book.

Significantly, no disclaimers on the Book or in advertising quell confusion or indicate that a parody is intended. The lack of disclaiming language distinguishes this case from *Cliffs Notes,* where the label "A Satire" was used five times on the cover of the parody, and four times on the back. *See also Hoffman,* 255 F.3d 1180 (prominent disclaimer avoided confusion); *Twin Peaks*, 996 F.2d at 1379 (2d Cir. 1993) (disclaimers can warrant "special consideration").

### c. Defendants' Tarnishment Is Not Protected by the First Amendment

The Book's graphic images and language depicting Chuck Norris engaging in seamy activity and linking his name with violent, racist, or vulgar language and otherwise objectionable material reaches beyond a "harmless, clean pun." *Tommy Hilfiger Licensing, Inc. v. Nature Labs, LLC,* 221 F. Supp. 2d 410, 423 (S.D.N.Y. 2002) (citation omitted). Numerous cases establish that First Amendment does not protect this type of damaging, unlawful speech. *See, e.g. Chemical Corp. of America v. Anheuser-Busch, Inc.*, 306 F.2d 433 (5th Cir. 1962), cert. denied, 372 U.S. 965, 83 S. Ct. 1089, 10 L.Ed.2d 129 (1963); *Original Appalachian Artworks, Inc. v. Topps Chewing Gum*, 642 F. Supp. Page 32 1031 (N.D. Ga. 1986); *Coca-Cola Co. v. Gemini Rising, Inc.*, 346 F. Supp. 1183 (E.D.N.Y. 1972) (enjoining use of "Enjoy Cocaine" posters that mimiced the Coca-Cola trademark). Statements in the Book such as "Chuck Norris likes his girls like he likes his whiskey – twelve years old and mixed up with coke" similarly exceed the bounds of First Amendment protection because  they will tarnish his mark and potentially interfere with his ability to commercially exploit his name.

### d. Public Interest in Avoiding Confusion Outweighs Public Interest in Free Expression

Here, Defendants' exploitation of Chuck Norris's name and celebrity value is blatant and commercial. Kessler Decl. at ¶ 9 (noting Penguin's comment in USA Today expressing interest

in boosting sales, not freedom of expression).    Defendants' purely commercial interest in profiting from sales of a book collecting "facts" that are otherwise available for free on the Internet should not outweigh the public interest in avoiding deception or Mr. Norris's interest in protecting his reputation and goodwill. *See, e.g., Cliffs Notes,* 886 F.2d at 493-94.

## B. Sufficiently Serious Questions as to the Merits Warrant Injunctive Relief.

Even if the likelihood of success on the merits were not so clearly established, injunctive relief is warranted in light of the sufficiently serious questions as to the merits, and the balance of equities weighing strongly in Mr. Norris's favor. *E.g., LeSportsac, v. Kmart Corp.* 754 F.2d 71, 76-79 (2d. Cir. 1985) (affirming grant of injunctive relief, noting that at the least, serious questions were raised as to likelihood of confusion); *Polyglycoat Corp. v. Environmental Chemicals, Inc.,* 509 F. Supp. 36, 39 (S.D.N.Y. 1980) (granting injunction where serious question raised as to likelihood of confusion).    Defendants recklessly decided not to seek or obtain Mr. Norris's consent before intentionally misappropriating his identity for their own commercial gain.    They failed to include a disclaimer stating that Mr. Norris had not consented to their use of his name, trademarks, and identity; to the contrary, Defendants falsely suggest that Mr. Norris approves of the Book.    The evidence shows that consumers have been confused by Defendants' statements and failure to provide a disclaimer; the newspapers have widely reported that the Book is a biography.    Kessler Decl. at ¶ 13, Ex. 15 attached thereto.    The public can access "facts" via the Internet, therefore halting the Book's publication will not unduly burden public interest in free expression.

## C.    Mr. Norris Will Suffer Irreparable Harm Without a Preliminary Injunction.

The threat of irreparable harm here is plain.    Defendants' unauthorized use of Chuck Norris's name, marks and persona diminish Mr. Norris's goodwill and preempts his ability to control the use of his name, image, and trademarks in a commercial context.    The threat of

irreparable harm here is plain. Defendants' unauthorized use of Chuck Norris's name, marks and persona diminish Mr. Norris's goodwill and preempts his ability to control the use of his name, image, and trademarks in a commercial context. The Book's title falsely claims to convey "The Truth" about Chuck Norris, which has already confused reporters into believing the Book is a biography; the Defendants' use of Mr. Norris's name and image in illegal, vulgar, and crude contexts may well tarnish his image in the eyes of his loyal fans and the public. These crude images have already disappointed and confused consumers. Kessler Decl. at ¶ 8, and Exhibit 6; Lodge Decl. ¶¶ 8,9. Defendants' recent YouTube video commercial demonstrates that they will continue to recklessly abuse Mr. Norris's name and likeness unless enjoined by this Court.

In Lanham Act claims, a risk of irreparable harm is also established upon a showing of likelihood of confusion. *Kraft General Foods v. Allied Old English*, 831 F. Supp. 123, 127 (S.D.N.Y. 1993) (*quoting American Cynamid Co. v. Campagna Per Le Farmacie In Italia, S.P.A.*, 847 F.2d 53, 55 (2d Cir. 1988) (citations omitted)). A likelihood of dilution also establishes irreparable harm under § 43(c) of the federal anti-dilution statute. *Clinique*, 945 F. Supp. at 550.

## IV. CONCLUSION

Defendants' reckless and willful misappropriation of Chuck Norris's name and identity for their own commercial purposes has been shown to confuse and mislead members of the public and violates Mr. Norris's trademark and publicity rights, to his severe and irreparable harm and diminishment of his right to control the commercial use of his name and image. Defendants' tarnishment of Mr. Norris' image is also causing him severe and irreparable harm. Accordingly, this Court should grant Plaintiff's motion for emergency preliminary relief to restrain Defendants from further violations of Mr. Norris's trademark, publicity and other related rights.

Dated:  New York, N.Y.
        January 11, 2008

Respectfully submitted,

PATTON BOGGS LLP

By: _____
Anthony Laura AL-3091
Deborah M. Lodge DL-8774

1675 Broadway, 31st Floor
New York, NY 10019-5820
(646) 557-5100

2550 M Street NW
Washington, D.C.  20037
202-457-6000

Attorneys for Plaintiff

26

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| **CARLOS RAY NORRIS,** | ) | |
| **a/k/a CHUCK NORRIS, an individual,** | ) | **Civil Action No. 07-cv-11480** |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **PENGUIN GROUP (USA), INC.,** | ) | **CERTIFICATE OF SERVICE** |
| **a Delaware corporation,** | ) | |
| **IAN SPECTOR, an individual and** | ) | |
| **QUBEFACTOR, INC., a New York** | ) | |
| **Corporation, d/b/a QUBEFACTOR** | ) | |
| **TECHNOLOGIES,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

JOHN J. ZEFUTIE, JR. certifies as follows:

1.      I am not a party to this action, I am over eighteen years of age, and I am employed by Patton Boggs LLP, The Legal Center, One Riverfront Plaza, Newark, New Jersey 07102. Patton Boggs is counsel for Plaintiff Carlos Ray Norris ("Plaintiff") in the above-captioned action.

2.      On January 11, 2008, I served Plaintiff's Notice of Motion, Brief in Support of Preliminary Injunction, Declaration of Carlos Ray Norris (with Exhibits), Declaration of Deborah M. Lodge (with Exhibits), and Declaration of Michael G. Kessler (with Exhibits), by causing a true and correct copy of each of the aforementioned documents to be hand delivered to the following counsel for defendants at the last known address set forth below:

> Dean Ringel, Esq.
> Cahill Gordon & Reindel LLP
> 80 Pine Street
> New York, NY 10005

I certify under penalty of perjury that the foregoing is true and correct. Executed on January 11, 2008.

John J. Zefutie, Jr.

51138