**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
CARLOS RAY NORRIS, :
a/k/a CHUCK NORRIS, an individual :
:
Plaintiff, :
:
- v - :          Civil Action No.: 07-CV-11480
:          (RWS) (ECF case)
PENGUIN GROUP (USA) INC., a Delaware :
Corporation, IAN SPECTOR, an individual and :
QUBEFACTOR, INC., a New York Corporation, :
d/b/a QUBEFACTOR TECHNOLOGIES, :
:
Defendants. :
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO
## PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

Dean Ringel
Gail Johnston
Andrea Butler
Cahill Gordon & Reindel LLP
80 Pine Street
New York, New York  10005
(212) 701-3000

Attorneys for Defendants
Penguin Group (USA) Inc., Ian Spector,
and QubeFactor, Inc.

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ................................................................................ 1

STATEMENT OF FACTS .................................................................................... 2

PROCEDURAL HISTORY .................................................................................... 5

ARGUMENT ....................................................................................................... 6

I.    PLAINTIFF CANNOT MEET THE BASIC REQUIREMENTS FOR A
      PRELIMINARY INJUNCTION, LET ALONE THE DEMANDING
      REQUIREMENTS TO OBTAIN THE RECALL OF AN EXPRESSIVE
      WORK ...................................................................................................... 6

II.   THE FIRST AMENDMENT PROTECTS BOOKS AS EXPRESSIVE
      SPEECH ................................................................................................... 7

III.  PLAINTIFF HAS FAILED TO ESTABLISH A LIKELIHOOD OF
      SUCCESS ON ANY OF HIS CLAIMS OR TO OTHERWISE
      SATISFY THE REQUIREMENTS FOR A PRELIMINARY
      INJUNCTION ............................................................................................ 8

      A.   Norris Is Not Likely to Succeed on His Trademark Claims (Counts
           1-3) .................................................................................................. 8

           1.   The Second Circuit Affords Special Protection to Expressive
                Speech in the Trademark Context. .................................................. 8

           2.   While *Rogers* Renders Analysis of the *Polaroid* Factors
                Unnecessary, Those Factors, In Any Event, Show No
                Likelihood of Confusion. ............................................................. 13

      B.   Norris Is Not Likely to Succeed on His Trademark Dilution and
           Tarnishment Claims (Counts 4, 7) ...................................................... 17

      C.   Norris Is Not Likely to Succeed on His Cybersquatting Claim
           (Count 5) ......................................................................................... 18

      D.   Norris Is Not Likely to Succeed on His Right of Publicity Claim
           (Count 6) ......................................................................................... 20

      E.   Norris Is Not Likely to Succeed on His Common Law Claims
           (Counts 8, 9) .................................................................................... 22

IV.   PLAINTIFF'S CLAIM FOR INJUNCTIVE RELIEF IS ALSO
      BARRED BY THE DOCTRINES OF ACQUIESCENCE, ESTOPPEL
      AND LACHES ........................................................................................... 22

CONCLUSION ..................................................................................................................25

# <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

<u>Cases</u>

*Burnett* v. *Twentieth Century Fox Film Corp.*, 491 F. Supp. 2d 962
(C.D. Cal. 2007)...................................................................... 7n, 10n, 13,
17 -18

*Business Trends Analysts* v. *Freedonia Group, Inc.*, 650 F. Supp.
1452 (S.D.N.Y. 1987)............................................................ 24n

*Campbell* v. *Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994) .............................. 8

*Cardtoons, L.C.* v. *Major League Baseball Players Ass'n*, 95 F.3d
959 (10th Cir. 1996) .............................................................. 6, 7, 7n, 8,
10, 20, 21n

*Charles Atlas, Ltd.* v. *DC Comics, Inc.*, 112 F. Supp. 2d 330 (S.D.N.Y.
2000)...................................................................................... 10n, 16-17

*Cliffs Notes Inc.* v. *Bantam Doubleday Dell Pub'g Group Inc.*, 886
F.2d 490 (2d Cir. 1989) ........................................................ 7, 9, 10n,
13, 22n

*Deere & Co.* v. *MTD Prods., Inc.*, 41 F.3d 39 (2d Cir. 1994) ........................ 18n

*Dorsey* v. *Black Pearl Pub.*, 2006 WL 3327874 (D.N.J. Nov. 14,
2006) ..................................................................................... 8n

*ETW Corp.* v. *Jireh Publ'g, Inc.*, 332 F.3d 915 (6th Cir. 2003)...................... 7, 9, 10n,
13, 20, 21n

*Forest City Daly Hous., Inc.* v. *Town of North Hempstead*, 175 F.3d
144 (2d Cir. 1999)................................................................. 6, 13

*Fox News Network LLC* v. *Penguin Group (USA) Inc.*, 31 Media L.
Rep. [BNA] 2254 (S.D.N.Y. 2003) ..................................... 10n-11n

*Frosch* v. *Grosset & Dunlap, Inc.*, 75 A.D.2d 768 (1st Dep't 1980).............. 7n, 21n

*Girl Scouts of the U.S.A.* v. *Bantam Doubleday Dell Publ'g Group,
Inc.*, 808 F. Supp. 1112 (S.D.N.Y. 1992), *aff'd*, 996 F.2d 1477
(2d Cir. 1993)........................................................................ 10n, 16

*Groden* v. *Random House, Inc.*, 61 F.3d 1045 (2d Cir. 1995) ........................ 22n

**Page**

*Grodin* v. *Liberty Cable*, 244 A.D.2d 153 (1st Dep't 1997) ............................ 22

*Hampton* v. *Guare*, 195 A.D.2d 366 (1st Dep't 1993) ..................................... 22

*Hicks* v. *Casablanca Records*, 464 F. Supp. 426 (S.D.N.Y. 1978) ................... 7n, 21, 21n

*Hoffman* v. *Capital Cities/ABC, Inc.*, 255 F.3d 1180 (9th Cir. 2001) .............. 21n

*Hormel Foods Corp.* v. *Jim Henson Prods., Inc.*, 73 F.3d 497 (2d Cir. 1996) ......................................................................................... 13-14

*Hustler Magazine* v. *Falwell*, 485 U.S. 46 (1998) ............................................ 8n-9n

*Lamparello* v. *Falwell*, 420 F.3d 309 (4th Cir. 2005) ...................................... 17-19

*Le Cordon Bleu* v. *BPC Publ'g Ltd.*, 327 F. Supp. 267 (S.D.N.Y. 1971) ......... 24n

*L.L. Bean, Inc.* v. *Drake Publishers, Inc.*, 811 F.2d 26 (1st Cir. 1987) ............ 18n

*Lusk* v. *Village of Cold Spring*, 475 F.3d 480 (2d Cir. 2007) .......................... 6, 22n

*Mattel, Inc.* v. *MCA Records, Inc.*, 296 F.3d 894 (9th Cir. 2002) ................... 13, 18

*Matthews* v. *Wozencraft*, 15 F.3d 432 (5th Cir. 1994) ................................... 20-21

*Meeropol* v. *Nizer*, 361 F. Supp. 1063 (S.D.N.Y. 1973) .................................. 24n

*New Era Publ'ns Int'l, APS* v. *Henry Holt and Co.*, 695 F. Supp. 1493 (S.D.N.Y. 1988), *aff'd*, 873 F.2d 576 (2d Cir. 1989) ............................... 21n

*New York Stock Exch., Inc.* v. *Gahary*, 196 F. Supp. 2d 401 (S.D.N.Y. 2002) ........................................................................................ 7n

*New York Times Co.* v. *Sullivan*, 376 U.S. 254 (1964) .................................... 9n, 21n

*Nora Beverages, Inc.* v. *Perrier Group of Am., Inc.*, 269 F.3d 114 (2d Cir. 2001) .......................................................................................... 15

*Page* v. *Something Weird Video*, 960 F. Supp. 1438 (C.D. Cal. 1996) ................................................................................................... 22n

*Parenting Unlimited Inc.* v. *Columbia Pictures Television, Inc.*, 743 F. Supp. 221 (S.D.N.Y. 1990) ......................................................... 24

*Paulsen* v. *Personality Posters, Inc.*, 59 Misc. 2d 444, (Sup. Ct. Spec. T. N.Y. Co. 1968) ............................................................. 21

**Page**

*Roberts* v. *Atlantic Recording Corp.*, 892 F. Supp. 83 (S.D.N.Y. 1995) ................................................................................. 24n

*Rogers* v. *Grimaldi*, 875 F.2d 994 (2d Cir. 1989) ............................. 6, 10, 10n, 11-13, 16, 20

*Société Des Hotels Meridien* v. *Lasalle Hotel Operating P'ship, L.P.*, 2002 WL 1918136 (S.D.N.Y. Aug. 19, 2002) ................... 16

*Spahn* v. *Julian Messner, Inc.*, 21 N.Y.2d 124 (1967) ...................... 21n

*Stephano* v. *News Group Publ'ns, Inc.*, 64 N.Y.2d 174 (1984) ...................... 22

*Streetwise Maps, Inc.* v. *Vandam, Inc.*, 159 F.3d 739 (2d Cir. 1998) .............. 17

*Time, Inc.* v. *Hill*, 385 U.S. 374 (1966) .............................................. 21n

*Tom Doherty Assocs.* v. *Saban Entm't, Inc.*, 869 F. Supp. 1130 (S.D.N.Y. 1994), *aff'd on other grounds*, 60 F.3d 27 (2d Cir. 1995) ................................................................................. 24n

*Tommy Hilfiger Licensing, Inc.* v. *Nature Labs, LLC*, 221 F. Supp. 2d 410 (S.D.N.Y. 2002) ........................................................ 13, 14, 16

*Twin Peaks Productions, Inc.* v. *Publications Int'l Ltd.*, 996 F.2d 1366 (2d Cir. 1993) .................................................................. 8, 10

*In re United States Lines, Inc.*, 318 F.3d 432 (2d Cir. 2003) ............. 22-23

*Velez* v. *VV Publ'g Co.*, 135 A.D.2d 47 (1st Dep't 1988) ................. 22n

*White* v. *Samsung Elecs. Am., Inc.*, 971 F.2d 1395 (9th Cir. 1992) ................ 21n

*Yankee Publ'g Inc.* v. *News Am. Publ'g Inc.*, 809 F. Supp. 267 (S.D.N.Y. 1992) .................................................................. 9-10, 11n, 14, 18n

## Constitutional Provisions

U.S. Const. amend. I ........................................................................... *passim*

## Law Reviews

Pratheepan Gulasekaram, *Policing the Border Between Trademarks and Free Speech: Protecting Unauthorized Trademark Use in Expressive Works*, 80 Wash. L. Rev. 887 (2005) ........................... 10n

**Page**

**Statutes**

N.Y. Civ. Rights Law

§ 50 (McKinney 1992) ................................................................ 21
§ 51 (McKinney Supp. 2008) ..................................................... 21

Tex. Prop. Code Ann.

§ 26.012 (Vernon 2000) .............................................................. 22n

Trademark Law

15 U.S.C. § 1125 (2000), as amended ........................................ *passim*

**Treatises**

4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*, (4th ed. 2007) ................................................................ 15

Defendants Penguin Group (USA) Inc. ("Penguin"), Ian Spector ("Spector") and QubeFactor, Inc. respectfully submit this Memorandum of Law in opposition to the motion of Carlos Ray Norris, a/k/a/ Chuck Norris ("Norris" or "Plaintiff") for a preliminary injunction.

## PRELIMINARY STATEMENT

Chuck Norris is a public figure who attained fame as a film and television star and who most recently assumed a prominent role in the campaign of Republican Presidential candidate Mike Huckabee. Norris seeks to ban a book of humor with the tongue-in-cheek title *The Truth About Chuck Norris: 400 Facts About the World's Greatest Human* (the "Book") and two related domain names that link to a website that parodies Norris as a super-hero figure and touts the Book.

Quite apart from the overwhelming barriers to relief posed by the First Amendment and the statutory and common law, Norris's own actions demonstrate that he is not entitled to the extraordinary relief of a preliminary injunction. Mythical "facts" about Norris have been an entertaining Internet phenomenon for several years and, as Norris's website and his motion papers make clear, Norris has not objected to the facts phenomenon. (Plaintiff's Memorandum of Law in Support of His Motion for Preliminary Injunction ("PM") at 5-6) Norris has appeared on a number of television shows jocularly quoting some of the same "facts" of which he now complains. Norris also used the "facts" in a television commercial endorsing Governor Huckabee.[1] In short, far from condemning the farcical "Chuck Norris facts" phenomenon, Norris has both acquiesced in and profited from it. And although Plaintiff acknowledges learning of the book as early as May 18, 2007, he did not raise any questions about the Book until Oct. 24, 2007, and did not begin this litigation until Dec. 21, 2007 — long after retailers had received and begun selling the Book.

Plaintiff attempts to explain his inconsistency and delay — themselves a basis for denying

---

[1] A copy of this video is annexed as part of Exhibit 10 to the Declaration of Dean Ringel, dated Feb. 19, 2008 (the "Ringel Dec."). News accounts of Mr. Norris's role in the Huckabee campaign are annexed as Exhibits 11 to 14 to the Ringel Dec.

relief — by asserting that the Book (apparently, in his mind, unlike the website) "is clearly a commercial venture (not an 'expressive work')." (PM 20-21) But Courts have long held that books *are* expressive works, and do not lose the protection afforded under the First Amendment (and other applicable law) because they are sold for profit. Whether Norris's claims are framed in terms of right of publicity, Lanham Act, anti-dilution or any other theory, expressive speech in the form of satire or parody of a public figure is entitled to full First Amendment protection and is not to be treated as commercial speech merely because that speech is included in a book offered for sale. For this reason, as Judge Cote recognized in denying Norris's request for a temporary restraining order, Norris has no likelihood of success on the merits.[2]

## STATEMENT OF FACTS

In April 2005, Defendant Ian Spector launched www.4q.cc as a website containing satirical "facts" about the actor Vin Diesel. (Declaration of Ian Spector, dated Feb. 18, 2008 ("Spector Dec."), ¶ 3) In the summer of 2005, Spector conducted a poll on the website asking visitors which celebrity they would like to see be the subject of the next "fact generator." The winner was write-in candidate Chuck Norris (who had been the subject of many jokes on late-night comedy shows). As a result, in or about July 2005, Spector launched the Chuck Norris fact generator. (Spector Dec. ¶ 4) Farcical "facts" are submitted by visitors to the site. Spector selects from among them, and edits and posts the chosen submissions. Many suggested "facts" are never posted in any form. (Spector Dec. ¶ 7) By January 2005 the monthly number of website "hits" grew to 18 million (Spector Dec. ¶ 5) and the "facts" phenomenon was featured on such well-known websites as ESPN.com. (Spector Dec. ¶ 6)[3]

---

[2]    The denial of Norris's request for a temporary restraining order on Dec. 21, 2007 is not referred to in his papers. A copy of the transcript of the argument and Judge Cote's oral decision is attached as Exhibit 1 to the Ringel Dec.

[3]    At all times since its inception, the website has included a disclaimer, which reads, "the website and its creators are not affiliated with Vin Diesel, Chuck Norris, Mr. T, any motion picture corporation, any television corporation, parent or affiliate corporation." (Spector Dec. ¶ 11) The website contains ad-

Footnote continued on next page.

In 2006, Spector and his father met with Norris and his wife Gena at the Mohegan Sun Casino at Gena Norris's invitation. (Spector Dec. ¶ 13)  They talked about Norris's World Combat League and his recent book, the origins of Spector's website and the Chuck Norris facts phenomenon. (Spector Dec. ¶ 14)  At no time during this meeting did Norris, his wife, or anyone else express disapproval of the website, nor did Norris suggest that he objected to any facts on the website or ask Spector to remove any facts. (Spector Dec. ¶ 14)  Spector and Gena Norris exchanged cordial e-mails in the weeks that followed, and Norris appeared on a number of television shows reading selected "Chuck Norris Facts." (Videoclips of these appearances are included in Exhibit 10 to the Ringel Dec.)  In 2007, Norris appeared in a commercial for the Mountain Dew soft drink that drew on the Chuck Norris phenomenon. (PM 6) (*See* Ringel Dec. Ex. 10)

By early 2007, Spector began working with Patrick Mulligan ("Mulligan"), an associate editor at Gotham Books ("Gotham"), a division of defendant Penguin, to compile the "facts" into a book. (Declaration of Patrick Mulligan, dated Feb. 15, 2008 ("Mulligan Dec.") ¶ 5)  Gotham made information about the Book available to retailers as early as May 12, 2007 by electronic feed to online booksellers such as Amazon.com which have direct access to the Gotham database containing descriptions of upcoming book releases. (Mulligan Dec. ¶ 10)  On May 17, 2007, Mulligan submitted a posting to *Publisher's Lunch*, a well-known "deal round-up" website for the publishing industry that gathers stories of interest to the publishing community.  The posting announced the pending publication of a new book in the "Pop Culture" category:  "Ian Spector's *The Truth About Chuck Norris*, an illustrated book of 400 farcical 'facts' about movie star Chuck Norris." (Mulligan Dec. ¶ 11)

Norris acknowledges that he was aware of the Book (including its "mythical" facts focus)

---

Footnote continued from previous page.

vertisements placed by Google, but Spector has never sold any merchandise relating to Chuck Norris or using Norris's name, appearance or likeness. (Spector Dec. ¶ 8)

as early as May 18, 2007.  (Norris Rep. #(i))[4]  Norris also acknowledges viewing the cover art for

the Book (posted on Amazon.com and other websites), by August 7, 2007.  (Norris Rep. #(ii)).

That cover art plainly reflected the farcical nature of the "facts" about "the World's Greatest Hu-

man".  (Mulligan Dec. ¶ 8)  The Amazon.com posting referred to an anticipated November publi-

cation date.  (Mulligan Dec. Ex. 14)  The Book was printed in September, and covers were deliv-

ered for binding on October 9.  The Book was bound on Oct. 23, 2007 and delivered to the pub-

lisher on Oct. 24, 2007.  (Mulligan Dec. ¶¶ 15, 16)

On October 24, Plaintiff, through counsel, for the first time questioned the Book.  Attach-

ments to that letter reflect that Norris's lawyers had conducted searches relating to Spector's web-

site at least as early as August 14, 2007 and include material from Amazon and other retailers re-

ferring to a November publishing date; the letter itself reflects awareness of a Nov. 29, 2007 pub-

lication date.  (Declaration of Deborah M. Lodge dated Jan. 11, 2008 ("Lodge Dec.") Ex. 2 at 2;

Ringel Dec. Ex. 2)[5]  Two days later, Alexander Gigante, Penguin's Senior Vice President, in-

formed Norris's lawyers that Penguin would not accede to Norris's demands, explaining that the

protection afforded to humor and parody under the Lanham Act, right of publicity statutes and

similar bodies of law and under the First Amendment protected the Book.  (Ringel Dec. Ex. 3)  In

the face of this unequivocal expression of Penguin's intent to proceed, Norris was silent for three

weeks, during which period the Book, already printed and bound, was shipped to distributors and

retailers in keeping with the planned publication date.  (Mulligan Dec. ¶¶ 17-18)

On November 16, counsel for Norris e-mailed a second letter seeking to halt publication of

---

[4]     Representation of Plaintiff's counsel, Jan. 30, 2008 ("Norris Rep.") #(i).  These representations stem
from a Jan. 29, 2008 agreement between the parties to provide representations as to certain facts that
could be relied upon by the adverse party, in lieu of discovery prior to the preliminary injunction hear-
ing.  A copy of the agreement is attached as Ex. 6 to the Ringel Declaration.  Plaintiff's January 30
representations letter is attached to that declaration as Ex. 7.

[5]     For the convenience of the Court, the correspondence between Plaintiff's lawyers and Mr. Gigante is
also attached as Exhibits 2-5 to the Ringel Declaration.

the Book. (Ringel Dec. Ex. 4) Within minutes of receipt, Penguin responded, reiterating its position and confirming that Penguin was proceeding with publication. (Ringel Dec. Ex. 5) Nothing more was heard from Norris until December 21, five weeks after Penguin's response. By that date, Penguin had printed and bound more than 60,000 copies of the Book and shipped more than 45,000 copies to distributors and retailers, thousands of which had been sold to readers. (Mulligan Dec. ¶¶ 16, 22)

## PROCEDURAL HISTORY

Plaintiff commenced this litigation on Friday, Dec. 21, 2007, the last court day before Christmas. A TRO hearing was held that same day. Plaintiff's motion for a TRO was denied, and Judge Cote directed Norris to file any motion for a preliminary injunction by January 11.

At the TRO hearing, Plaintiff for the first time identified two passages in the Book that he claimed were objectionable because they allegedly would be understood as falsely suggesting his endorsement of the Book. The first, in the preface, noted that Spector "was still in touch" with Norris and his wife. The second, in the acknowledgements, thanked Norris for his "awesome sense of humor. Thanks for playing along." Judge Cote took note of Plaintiff's position on these passages, but determined that Defendants were likely to prevail. (Ringel Dec. Ex. 1 at 18-19) Although those statements were accurate when written and were not "endorsements," in the first post-hearing printing of the Book, Defendants voluntarily revised both sections to take account of Plaintiff's concerns. (Spector Dec. ¶ 24; Mulligan Dec. ¶ 19) The new acknowledgement omits all mention of Norris, and the new Preface states:

> "At the time, everything was cordial, and Chuck seemed amused by the site and the whole phenomenon of Chuck Norris facts. Later, however, Chuck hit me with some roundhouse kicks: first lawyers' letters and then a lawsuit filed right before Christmas 2007 demanding that we stop publication of this book. Safe to say Chuck's not amused anymore and has not given the book his endorsement." (Mulligan Dec. ¶ 20)

# ARGUMENT

## I. PLAINTIFF CANNOT MEET THE BASIC REQUIREMENTS FOR A PRELIMINARY INJUNCTION, LET ALONE THE DEMANDING REQUIREMENTS TO OBTAIN THE RECALL OF AN EXPRESSIVE WORK

In this Circuit, the general rule is that "[t]o obtain a preliminary injunction a party must demonstrate: (1) that [he or she] will be irreparably harmed if an injunction is not granted, and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation, and a balance of hardships tipping decidedly in its favor." *Lusk* v. *Village of Cold Spring*, 475 F.3d 480, 485 (2d Cir. 2007). Where, as here, however, the requested injunction "'will alter, rather than maintain, the status quo,'" Plaintiff faces "an even more rigorous standard — requiring a 'clear' or 'substantial' showing of likelihood of success." *Forest City Daly Hous., Inc.* v. *Town of North Hempstead*, 175 F.3d 144, 149-50 (2d Cir. 1999) (citation omitted). Plaintiff seeks to have all unsold books *recalled or repurchased* and to require Penguin to notify "key Internet search engines" to delete references to the book from their archives and search engines. (Notice of Motion for a Preliminary Injunction at 3) Because such an order would alter, rather than maintain, the status quo, Norris is required to make a clear or substantial showing of likelihood of success — which he has not done and cannot do.

Moreover, as even Plaintiff acknowledges (PM 23-24), the First Amendment issues at stake in this case require the Court to consider the "public interest." *Rogers* v. *Grimaldi*, 875 F.2d 994, 998-99 (2d Cir. 1989) ("We believe that in general the [Lanham] Act should be construed to apply to artistic works only where the public interest in avoiding consumer confusion outweighs the public interest in free expression."). The public interest favors dissemination of expression, including satires and parodies of public figures, particularly when the public figure thrusts himself into national politics, as Norris has done in his ubiquitous campaign appearances for Governor Huckabee. "'[T]he last thing we need, the last thing the First Amendment will tolerate, is a law that lets public figures keep people from mocking them.'" *Cardtoons, L.C.* v. *Major League Baseball Players Ass'n*, 95 F.3d 959, 973 (10th Cir. 1996) (citation omitted).

## II.    THE FIRST AMENDMENT PROTECTS BOOKS AS EXPRESSIVE SPEECH

The underlying premise of Plaintiff's claim is clear:  the Book is "a commercial venture (not an 'expressive work')," and is to be accorded lesser protection under the Constitution, statutes and common law for this reason.  (PM 20-21)  But that is not the law.  Books and other forms of expressive speech — whether biography or fiction, informational or merely entertainment — are not commercial speech and are not subject to the restrictions Norris would impose.

> "'That books, newspapers, and magazines are published and sold for profit does not prevent them from being a form of expression whose liberty is safeguarded by the First Amendment.'  The fact that expressive materials are sold does not diminish the degree of protection to which they are entitled under the First Amendment."

*ETW Corp.* v. *Jireh Publ'g, Inc.*, 332 F.3d 915, 924-25 (6th Cir. 2003) (internal citations omitted); *see also Cardtoons*, 95 F.3d at 970 ("Although the cards are sold in the marketplace, they are not transformed into commercial speech merely because they are sold for profit.").[6]

The protection against the claims asserted is particularly strong for parodies or satires of public figures.  "We start with the proposition that parody is a form of artistic expression protected by the First Amendment."  *Cliffs Notes Inc.* v. *Bantam Doubleday Dell Publ'g. Group. Inc.*, 886 F.2d 490, 493 (2d Cir. 1989).  A contrary rule permitting an extension of intellectual property rights to require a license as a pre-condition to the use of a celebrity's name, trademarks or copy-

---

[6]  Contrary to Plaintiff's contention (PM 22), this is true whether the invocation of plaintiff's name or likeness is relatively brief, as in *Burnett* v. *Twentieth Century Fox Film Corp.*, 491 F. Supp. 2d 962 (C.D. Cal. 2007), or pervades the work, as in the Norman Mailer novel, *Marilyn*, at issue in *Frosch* v. *Grosset & Dunlap, Inc.*, 75 A.D.2d 768 (1st Dep't 1980), or the baseball card parodies at issue in *Cardtoons*.  "[B]ooks and movies are vehicles through which ideas and opinions are disseminated and, as such, have enjoyed certain constitutional protections, not generally accorded 'merchandise.'"  *Hicks* v. *Casablanca Records*, 464 F. Supp. 426, 430 (S.D.N.Y. 1978) (regarding "fictional biography" of a period in the life of Agatha Christie).  Also contrary to Plaintiff's contentions (PM 16, 21), this is true even if a celebrity's actual name is used.  *New York Stock Exch., Inc.* v. *Gahary*, 196 F. Supp. 2d 401, 412-13 (S.D.N.Y. 2002) (a contrary rule "simply cannot be correct where parody of famous figures is concerned.  Such parodies routinely use the full names of prominent public personalities as part of their humorous message.  Yet no one could seriously suggest that the targets of these parodies therefore have a claim for trademark infringement.").

rights for parody would eliminate such parodies. *See Campbell* v. *Acuff-Rose Music, Inc.*, 510 U.S. 569, 592 (1994) ("[T]he unlikelihood that creators of imaginative works will license critical . . . lampoons of their own productions removes such uses from the very notion of a potential licensing market"); *Cardtoons,* 95 F.3d at 972-73. As the Second Circuit observed, "Copyright holders rarely write parodies of their own works." *Twin Peaks Productions, Inc.* v. *Publications Int'l Ltd.*, 996 F.2d 1366, 1377 (2d Cir. 1993).[7] It is the essence of free speech to allow comment about, and even parody of, public figures.

## III. PLAINTIFF HAS FAILED TO ESTABLISH A LIKELIHOOD OF SUCCESS ON ANY OF HIS CLAIMS OR TO OTHERWISE SATISFY THE REQUIREMENTS FOR A PRELIMINARY INJUNCTION

### A. Norris Is Not Likely to Succeed on His Trademark Claims (Counts 1-3)

#### 1. The Second Circuit Affords Special Protection to Expressive Speech in the Trademark Context.

The Lanham Act cannot be used by a public figure or celebrity to restrict expressive comment about him, whether that expression takes the form of fiction or nonfiction, criticism, satire, or parody.[8] As a result, the Second Circuit, in reversing a district court's grant of a preliminary

---

[7]   As Judge Cote recognized simply by looking at its cover, it is clear that the Book is a parody. Ringel Dec. Ex. 1 at 17:25-18:4 ("It also appears to me that the defendants will be able to show that this book, even from perusal of just the cover alone, conveys that it is a parody. And of course once you open the book, that becomes crystal clear."). It is fair to say that no reasonable person could understand a book entitled "*400 Facts about the World's Greatest Human,*" with cover art depicting a person standing on a live dinosaur, as anything other than humorous fiction.

Plaintiff's reliance on *Dorsey* v. *Black Pearl Pub.*, 2006 WL 3327874 (D.N.J. Nov. 14, 2006) (PM 21), is misplaced. *Dorsey* involved the use of an actual photograph of plaintiff as the cover art on a crime book, which bore no connection to plaintiff. It provides no guidance on the radically different facts at issue here. Plaintiff also contends that the characterization of parody is inappropriate because Defendants "compete with Plaintiff for the sale of 'facts' merchandise and for books in general." (PM 22) But even if such allegations somehow affected the parody nature of the Book, the reality is that Spector has never sold "facts" merchandise (Spector Dec. ¶ 8) and it is impossible to imagine competition between the Book and Norris's inspirational or other writings.

[8]   Like the plaintiff in *Hustler Magazine* v. *Falwell*, 485 U.S. 46 (1998), much of Norris's complaint seems grounded in displeasure with the perceived *reputational* effects of the Book, which Plaintiff contends contains "unsavory portrayals of him" and is offensive and sacrilegious and therefore "re-

Footnote continued on next page.

injunction under the Lanham Act against a parody, has held that "in deciding the reach of the Lanham Act in any case where an expressive work is alleged to infringe a trademark, it is appropriate to weigh the public interest in free expression against the public interest in avoiding consumer confusion." *Cliffs Notes*, 886 F.2d at 494. An interpretation of the Lanham Act that fails to provide adequate protection to speech not only fails to honor the statute's intent, but violates the Constitution. Indeed, recognizing the constitutional constraints imposed by the First Amendment, the Second Circuit

> "has construed the Lanham Act narrowly when the unauthorized use of the trademark is for the purpose of a communicative message, rather than identification of product origin. Thus, where the unauthorized use of a trademark is for expressive purposes of comedy, parody, allusion, criticism, news reporting, and commentary, the law requires a balancing of the rights of the trademark owner against the interests of free speech."

*Yankee Publ'g Inc.* v. *News Am. Publ'g Inc.*, 809 F. Supp. 267, 276 (S.D.N.Y. 1992). Some cases may present difficult questions in determining the outcome of this balance. This is not one of them.

In *ETW*, the Sixth Circuit refused to interpret the Lanham Act to permit celebrity golfer Tiger Woods to assert a trademark claim that would effectively make him a "walking, talking trademark." 332 F.3d at 922. But that is precisely what Norris asks this Court to do. Here, it is plain that a parody or satire of the "superhero" Chuck Norris is an expressive or artistic work and

---

Footnote continued from previous page.

pugnant to . . . his honorable image." (PM 9, 10); *see also* Complaint ¶¶ 27, 46, 63. But as the Supreme Court made clear, the protections limiting a defamation claim, developed at common law and reinforced by the First Amendment, cannot be circumvented simply by calling the claim by another name. (While *Falwell* dealt with a claim denominated one for intentional infliction of emotional distress, this Court has observed that a refusal to apply these principles to a trademark claim "would seem to be at odds with the principles articulated in that case." *Gahary*, 196 F. Supp. 2d at 413 n.17.) Plaintiff, a public figure, does not plead specific statements alleged to be false and defamatory and published with actual malice as required by *New York Times Co.* v. *Sullivan*, 376 U.S. 254 (1964) and its progeny. This provides a bar under *Falwell* to all claims asserted here.

thus, under the test applicable in this Circuit, not subject to the Lanham Act unless the reference to

Norris here has "no artistic relevance" to the underlying work or is "explicitly misleading" as to

the source or content of the work.[9]  *Rogers*, 875 F.2d at 999; *Twin Peaks*, 996 F.2d at 1379 (apply-

ing *Rogers* test); *Yankee Publ'g*, 809 F. Supp. at 282.[10]  There can be no question that the refer-

ence to Norris is "artistically relevant" to this expressive work.  The book parodies the mythic

"Chuck Norris."  The "Chuck Norris Facts" phenomenon is at the heart of the parody of Norris

and other larger-than-life figures.  This is as expressive as would be a book of political satire fo-

cusing on fictional "Sayings of George Bush."

Nor does the Book include any "explicitly misleading" statement of endorsement.  As the

caselaw recognizes, as a work of humorous parody it is unlikely that the subject of the parody (the

"World's Greatest Human") would have endorsed the Book.  *See Twin Peaks*, 996 F.2d at 1377;

*Cardtoons*, 95 F.3d at 974; *Yankee Publ'g*, 809 F. Supp. 2d at 273.[11]  Neither the cover nor the text

---

[9]    As a threshold matter, Plaintiff has not shown that the four trademarks identified by him apply in this
case given the narrow classes of use claimed for his marks.  The registrations for the name Chuck Nor-
ris are identified as "providing marital arts training services" (1997) and "entertainment services,
namely personal appearances and live performances by a movie star and actor; script writing, directing
and production of motion pictures; online information services relating to entertainment productions,
marital arts, anti-drug and maximization of life opportunities and philosophies."  In the case of the
Chuck Norris Facts, the marks were registered *after* Spector's first use of the phrase on his website.
(*Compare* Norris Dec. Ex. 2 with Spector Dec. ¶ 4.)  Plaintiff, of course, bears the burden of showing
probable success on his claims.

[10]    Although *Rogers* dealt with a challenge to a movie title, it recognized that free speech principles apply
to the "use of a celebrity's name in the title and *text* of a fictional or semi-fictional book or movie,"
875 F.2d at 1003-04 (emphasis added).  The *Rogers* test has been applied to use of trademarks, images,
or characters in text as well as on the cover or title of a work.  *See e.g.*, *Charles Atlas, Ltd* v. *DC Com-
ics, Inc.*, 112 F. Supp. 2d 330, 338-39 (S.D.N.Y. 2000); *ETW*, 332 F.3d at 926; *Girl Scouts of the
U.S.A.* v. *Bantam Doubleday Dell Publ'g Group, Inc.*, 808 F. Supp. 1112, 1121-22 (S.D.N.Y. 1992),
*aff'd*, 996 F.2d 1477 (2d Cir. 1993); *Burnett*, 491 F. Supp. 2d 962, 972-73 (C.D. Cal. 2007).  If any-
thing, there is less likelihood of confusion, *i.e.* a stronger showing of confusion must be made, with re-
spect to use in the text, since the text would make the satiric or parodic character of the work clear to
the reader even if the cover were ambiguous.  *See* Pratheepan Gulasekaram, *Policing the Border Be-
tween Trademarks and Free Speech: Protecting Unauthorized Trademark Use in Expressive Works*, 80
Wash. L. Rev. 887 at 921-22 (2005).

[11]    Plaintiff complains of the absence of a disclaimer stating that the book is a parody, but the law requires
none.  *Cliffs Notes*, 886 F.2d at 496; *Fox News Network LLC* v. *Penguin Group (USA) Inc.*, 31 Media

Footnote continued on next page.

of the Book carries a single word or image that could be construed to constitute the "explicit en-dorsement" required under *Rogers* for Plaintiff to proceed further.

In the absence of any explicit endorsement (and in light of the parody nature of the Book), at the TRO hearing, Plaintiff focused on two passages, one in the preface and one in the acknowl-edgement, as the basis for his claim that the Book includes a false implied "endorsement" (which is inadequate under *Rogers*, in any event). Despite Plaintiff's claims, however, neither section re-flects an endorsement by Norris, explicit or otherwise.[12] As author Ian Spector explains in his dec-laration, Norris and his wife, Gena, had had friendly, social exchanges with Spector (Spector Dec. ¶¶ 13-14), and Spector exchanged e-mails with Gena Norris (*Id.* ¶ 17). Norris even appeared on television reading Chuck Norris facts, including some he now challenges. (*Compare* Ringel Dec. Ex. 10 with PM at 7 regarding the "fact" "Chuck Norris's tears cure cancer. Too bad he has never cried.") Thereafter Norris made the Mountain Dew ad alluding to the "facts" phenomenon. (Spector Dec. ¶ 23) Norris had, indeed, "played along." When Spector wrote the Book (January 2007), when he wrote the preface and acknowledgement (June 2007) and when the Book was

---

Footnote continued from previous page.

> L. Rep. [BNA] 2254 (S.D.N.Y. 2003) (denying injunction against parody despite absence of dis-claimer); *Yankee Publ'g*, 809 F. Supp at 281 ("[t]here is no requirement that a parody identify itself by a label stating, 'parody.'") Moreover, the absence of any intent to deceive anyone that the Book is anything but parody is reflected in the designation of the Book as "humor' at the lower left of its back cover. This designation, while not aimed directly at consumers, is designed to ensure that the book is sold in a retailer's "humor" or similar section. (*See* Mulligan Dec. at ¶9.)

[12]   The complained-of text in the preface stated:

> "The day of reckoning came, and I went up to the Mohegan Sun resort with my dad for the meeting. It ended up being about an hour long or so and included not only myself and Chuck, but also my dad, Chuck's wife Gena, Chuck's lawyer, and Chuck's business manager. Despite those extra folks, we had a pretty interesting conversation ranging from the origins of the site to Chuck's charity (he's really big on it), the Combat League, his book, where the facts originated, my interests, et cetera. I'm still in touch with Chuck and Gena, and to date I've not yet been on the receiving end of a roundhouse kick." (Mulligan Dec. Ex. 1 at xi)

> The complained-of text in the acknowledgement stated: "And of course to Chuck: You've got an awesome sense of humor. Thanks for playing along." *Id.* at 161.

printed and bound (September-October 2007), Spector and Penguin had every reason to believe Spector's statements were accurate.  (Spector Dec. ¶ 23, Mulligan Dec. ¶ 7)

Although Judge Cote had concluded that Plaintiff was unlikely to show likelihood of success even with the complained-of passages in the Book (Ringel Dec. Ex. 1 at 18-19), upon learning of Norris's objection to these passages, Defendants removed them from the very next printing of the Book and made explicit in revised text that Norris did *not* endorse the book.[13]  (Spector Dec. ¶ 24, Mulligan Dec. ¶¶ 19-21)  As a result, Defendants have now eliminated any possible issue as to Norris's endorsement of the Book.  There is thus no basis to premise a preliminary injunction on a claim of confusion as to endorsement since the Book (1) is a satire or parody, a genre which the courts have recognized as unlikely to be understood to have been endorsed by their subjects; (2) contained no false endorsement, explicit or otherwise; (3) no longer includes the language that Plaintiff focused on in making such argument; and (4)  now explicitly disclaims any endorsement by Norris.

*Rogers* limits the application of the Lanham Act involving expressive speech about celebrities to two circumstances:  the use of the mark has "no artistic relevance" to the underlying work or is "explicitly misleading" as to the source or content.  Neither of those circumstances being present here, it is plain that the Lanham Act does not apply to this expressive work.  Injunctive relief therefore can be denied on that basis alone, without the need for analysis of the *Polaroid* factors, a test the Second Circuit has recognized is "awkward at best" with respect to expressive speech.

---

[13]  The reference to Norris in the acknowledgement was deleted in its entirety and the revised text in the preface states:

"What I thought would be my day of reckoning ended up being a pretty interesting conversation involving my father, Chuck, his wife Gena, and Chuck's business manager and lawyer, ranging from the origins of the site to Chuck's charity, Kick Start.  At the time, everything was cordial, and Chuck seemed amused by the site and the whole phenomenon of Chuck Norris facts.  Later, however, Chuck hit me with some roundhouse kicks: first lawyers' letters and then a lawsuit filed right before Christmas 2007 demanding that we stop publication of this book.  Safe to say Chuck's not amused anymore and has not given the book his endorsement."  (Mulligan Dec. Ex. 4)

*Cliffs Notes*, 886 F.2d at 495 n.3 (reversing district court's grant of injunction); *see also Rogers*, 875 F.2d at 1000-01 (denying injunction without application of Polaroid factors); *accord ETW*, 332 F.3d at 926, 928 and n.12 (adopting Second Circuit two-part test and explicitly rejecting application of traditional "likelihood of confusion test"); *Mattel, Inc.* v. *MCA Records, Inc.*, 296 F.3d 894, 902 (9th Cir. 2002) (explicitly adopting and applying Second Circuit's two-part test); *Burnett*, 491 F. Supp. 2d at 973 (same). The Court need proceed no further with respect to Plaintiff's Lanham Act claims.

### 2. While *Rogers* Renders Analysis of the *Polaroid* Factors Unnecessary, Those Factors, In Any Event, Show No Likelihood of Confusion.

While *Rogers* is best understood as rejecting the need for the traditional multi-factor analysis for determining likelihood of confusion where the *Rogers* two-part test is not satisfied, we briefly address the *Polaroid* standards to highlight Plaintiff's inability to demonstrate any likelihood of confusion, let alone the "clear" or "substantial" showing of the particular compelling likelihood of confusion needed to overcome the public interest in free expression implicated here. *Forest City Daly Hous.*, 175 F.3d at 149; *Rogers*, 875 F.2d at 1000-01.

1.    *The Strength of Norris's Marks*. Even if one accepted, without proof, that Norris's marks are well-recognized, this would only underscore Defendants' argument that there is no likelihood of confusion. "'The strength and recognizability of the mark may make it easier for the audience to realize that the use is a parody and a joke on the qualities embodied in trademarked word or image.'" *Tommy Hilfiger Licensing, Inc.* v. *Nature Labs, LLC*, 221 F. Supp. 2d 410, 416 (S.D.N.Y. 2002) (citation omitted). "That is, it is precisely because of the mark's fame and popularity that confusion is avoided. . . ." *Id.* Plaintiff's very fame makes it unlikely that a consumer would think that every book about Norris or referring to him had been endorsed by him.

2.    *The Similarity of the Marks*. "'[A]n inquiry into the degree of similarity between the two marks does not end with a comparison of the marks themselves.'" *Hormel Foods Corp.* v. *Jim Henson Productions*, 73 F.3d 497, 503 (2d Cir. 1996) (citation omitted). The context is also

relevant because "the setting in which a designation is used affects its appearance and colors the impression conveyed by it." *Id.* at 503 (citations and internal quotation marks omitted). Where, as here, "'the difference in wording or appearance of the designation together with the context and overall setting is such to convey to the ordinary viewer that this is a joke, not the real thing, then confusion as to source, sponsorship, affiliation, or connection is unlikely.'" *Tommy Hilfiger*, 221 F. Supp. 2d at 417 (citation omitted). Indeed, in the case of parody this factor is of "little pertinence" because "there is no likely confusion by reason of consumer recognition that the allusion to [the mark] is a joke and not a source identifier." *Yankee Publ'g*, 809 F. Supp. at 274.

3.    *The Competitive Proximity of the Products.*    There is little likelihood that readers would confuse Spector's humorous book with Norris's *The Secret Power Within* (thoughts on martial arts training and Zen) or any of the other works cited in Norris's complaint (¶ 13) and his declaration (¶ 5): *The Secret of Inner Strength:  My Story*, by Chuck Norris with Joe Hyam; *Against All Odds:  My Story*, by Chuck Norris and Ken Abraham; *Winning Tournament Karate*, by Chuck Norris; and *A Threat to Justice:  A Novel*, by Chuck Norris, Ken Abraham, Aaron Norris, and Tim Gragem.

4.    *The Likelihood That Norris Will Bridge the Gap and Offer a Product Like Defendants' Product.*    There is little risk that readers will confuse this book of humor with Norris's inspirational works. (Compare PM 16-17) Indeed, to make the comparison underscores the satiric intent.

5.    *Actual Confusion Between the Products.*    Plaintiffs offer strikingly sparse support for any claim of actual confusion despite the almost eight months that elapsed between the time information concerning the Book (including its title) was widely publicized (and the almost six weeks that passed since the Book was on sale throughout the country and on the Internet) and the time this motion was filed. The "evidence" of confusion proffered by Plaintiff consists largely of eight e-mails sent by fans to Norris's own website, redacted to omit any information identifying the sender. (Lodge Dec. ¶¶ 8-9) Setting aside issues as to the admissibility of such "evidence,"

-14-

each e-mail appears animated by a response to the report of Norris filing suit. None reflects a belief that Norris had endorsed the Book. Indeed, the only e-mail even to suggest such possibility (apparently based on the claim to that effect in this lawsuit), noted that any such approval "was hard for me to believe." (Lodge Dec. Ex. 6 (e-mail dated Dec. 23, 2007 from "n*1")) Although Plaintiff also submits excerpts from Internet blogs and comments posted by visitors to the 4q.cc website (see Declaration of Michael G. Kessler ("Kessler Dec.")), not a single submission reflects confusion on the part of the writer or poster.[14]

Even in trademark cases that do not implicate First Amendment concerns, courts have held consistently that "[e]vidence of only a small number of instances of actual confusion can be dismissed as inconsequential or *de minimis*." 4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*, § 23:14, at 23-92 (4th ed. 2007); *Nora Beverages, Inc.* v. *Perrier Group of Am., Inc.*, 269 F.3d 114, 123-24 (2d Cir. 2001) (affirming district court's finding that two anonymous customers who inadvertently bought defendant's water bottle when they intended to buy plaintiff's was *de minimis* anecdotal evidence and inadmissible hearsay). Here, 70,000 copies of the Book have been shipped, and the Book has been offered for sale on websites and in stores throughout the country. Plaintiff's failure to offer *any* instances of actual confusion in these circumstances weighs heavily in Defendants' favor. *See McCarthy* § 23:14 at 23-94 ("Evidence of the number of instances of actual confusion must be placed against the background of the number of opportunities for confusion. . . .").

---

[14] One blogger posits that Norris's "Christian fan base" will have been unaware of "the Chuck Norris Internet meme" and therefore might think he had endorsed a joke that offends them. Plaintiff offers no evidence to support this hypothesis by a blogger who himself conducted no survey of consumers, and which is dependent on an assumption of ignorance of Norris's own activities. This same blogger also flatly rejects the idea that, "as Norris's lawsuit claims" any of his fans "will believe the book's 'facts' are really factual." (Kessler Dec. Ex. 16) Plaintiff's only other reference to alleged confusion is to a newspaper headline referring to the Book as a biography. (Kessler Dec. Ex. 15) Of course, the reference to a "biography" (which appears only in the headline not the text of the article) is reporting on the Plaintiff's *Complaint*, not the Book. Any confusion in the headline writer's mind can only be a product of Plaintiff's Complaint.

The limited nature of Plaintiff's anecdotal evidence (which does not reflect actual confusion by *anyone*) and the absence of any scientific survey would cut against a finding of likely confusion in any case, but when, as here, expressive speech is at issue, courts apply an even more rigorous balancing test. Thus in *Rogers* itself, the Court found the balance between free expression and avoiding confusion tipped in favor of free expression even where a scientific survey found that 14% of consumers were confused. 875 F.2d at 1001 and n.8; *see also Charles Atlas, Ltd* v. *DC Comics, Inc.*, 112 F. Supp. 2d 330, 340 (S.D.N.Y. 2000) (finding plaintiff's evidence was "anecdotal at best, and does not purport to constitute any kind of systematic survey"); *Girl Scouts*, 808 F. Supp at 1128 (even a survey finding of 12.6% confusion was too small to demonstrate actual confusion "particularly in light of the Second Circuit's decision in *Rogers* v. *Grimaldi*"). Plaintiff's "evidence" falls so far short of these standards as to raise basic questions about his conduct of this litigation.

6.    *Defendants' Good or Bad Faith*. The bad faith "relevant in trademark cases . . . [is] an intent to capitalize on consumer deception or hitch a free ride on plaintiff's good will." *Tommy Hilfiger*, 221 F. Supp. 2d at 419. While "deliberate adoption of a similar mark may give rise, in the usual case, to a presumption that the copier intended to confuse consumers, in the case of parody, the intent is not necessarily to confuse the public but rather to amuse." *Id.* (citation and internal quotation marks omitted). Thus, "intent to parody is not an intent to confuse the public." *Id.* at 420. Plaintiff has offered no evidence to the contrary, and Spector has explicitly denied any intent to deceive consumers. (Spector Dec. ¶ 23).

7.    *Quality of the Defendants' Product*. "This factor enables the trademark holder to protect the 'good reputation associated with [its] mark from the possibility of being tarnished by inferior merchandise.'" *Société Des Hotels Meridien* v. *Lasalle Hotel Operating P'ship, L.P.*, 2002 WL 1918136, at *3 (S.D.N.Y. Aug. 19, 2002) (citation omitted). Plaintiff offers only conjecture on this point, focusing on the alleged "vulgar" nature of some facts in the Book. (PM 17) But courts consistently have declined to find that works deemed "vulgar" or "offensive" make

confusion more likely. *Charles Atlas, Ltd.*, 112 F. Supp. 2d at 332 (finding a "sexist and vulgar portrayal of the character" did not support a claim for trademark infringement). Indeed, "the more distasteful and bizarre the parody, the less likely the public is to mistakenly think the trademark owner has sponsored or approved it." *Burnett*, 491 F. Supp. 2d at 972.

8.    *Sophistication of Buyers*. This factor requires the court to consider the general impression of the "ordinary consumer, buying under normal market conditions and giving the attention such purchasers usually give in purchasing the product at issue." *Streetwise Maps, Inc.* v. *Vandam, Inc.*, 159 F.3d 739, 746 (2d Cir. 1998). Plaintiff again offers no evidence as to the buyers of this book, only vague statements that books are less expensive than houses, hardly enough to tip this factor towards Plaintiff. (PM 17)

Thus, even if the *Polaroid* factors are applied, Plaintiff has failed to meet his burden to establish a likelihood of confusion, let alone that there exists such risk of confusion as to outweigh the public's interest in free expression.

## B.   Norris Is Not Likely to Succeed on His Trademark Dilution and Tarnishment Claims (Counts 4, 7)

Plaintiff's effort to enjoin publication of the Book (or to seek its recall) under the Federal Anti-dilution Act contravenes the terms of the statute itself, as well as the Constitutional restrictions that shape and ultimately limit the statute. "A dilution action only applies to purely commercial speech. Parody is a form of non-commercial expression if it does more than propose a commercial transaction." *Burnett*, 491 F. Supp. 2d at 974 (citation omitted). The Book, like the parody of Carol Burnett, "does more than propose a commercial transaction." The anti-dilution statute is therefore inapplicable. *See Lamparello* v. *Falwell*, 420 F.3d 309, 313-314 (4th Cir. 2005) (Congress did not intend anti-dilution or cybersquatting laws "to impinge the First Amendment rights of critics and commentators" and therefore limited the reach of those laws to "the concept of

-17-

'commercial' speech from the 'commercial speech' doctrine").[15]

While First Amendment concerns exist with respect to trademark claims, such concerns are even more serious in the dilution context "because dilution lacks two very significant limitations that reduce the tension between trademark law and the First Amendment." *Mattel*, 296 F.2d at 904. First among these is that trademark law restricts only uses that risk consumer confusion. Second, trademark law seeks only to remedy such confusion — in effect to avoid a "fraud on the consuming public." *Id.* Because the anti-dilution law has no such built-in limits, it must be narrowly cabined to avoid constitutional challenges. The explicit statutory limits to wholly "commercial speech" and the explicit "fair use" exclusion for "parodying, criticizing or commenting upon the famous mark owner or the goods or services of the famous mark owner," 15 U.S.C. § 1125(c)(3)(A)(ii), serve that need. Those limits bar Plaintiff's claim here, because, as in *Mattel*, *Burnett* and *Lamparello*, the work in question is an "artistic and parodic work . . . considered non-commercial speech and therefore not subject to a trademark dilution claim." *Burnett*, 491 F. Supp. 2d at 974.[16]

### C. Norris Is Not Likely to Succeed on His Cybersquatting Claim (Count 5)

Like the anti-dilution amendment to the Lanham Act, the cybersquatting amendment applies only to commercial speech. *Lamparello*, 420 F.3d at 313-14. The speech on Spector's web-

---

[15] The Second Circuit has recognized that "[s]atirists, selling no product other than the publication that contains their expression, may wish to parody a mark to make a point of social commentary. . . . Such uses risk some dilution of the identifying or selling power of the mark, but that risk is generally tolerated in the interest of maintaining broad opportunities for expression." *Deere & Co.* v. *MTD Prods., Inc.*, 41 F.3d 39, 44 (2d Cir. 1994). Anti-dilution statutes may not be used to stifle even disparaging commentary. Otherwise, "a corporation could shield itself from criticism by forbidding the use of its name in commentaries critical of its conduct." *L.L. Bean, Inc.* v. *Drake Publishers, Inc.*, 811 F.2d 26, 33 (1st Cir. 1987).

[16] Plaintiff acknowledges that the standards under the federal and state laws are "essentially the same" (PM 18), and courts have consistently held that the same First Amendment principles that limit the federal anti-dilution law limit the New York statute as well. *See Yankee Publ'g*, 809 F. Supp. at 282 (the "same First Amendment considerations that limit a cause of action under the Lanham Act apply also to a cause of action under New York law").

site does more than simply propose a commercial transaction. Moreover, even if the Act did apply, Plaintiff's cybersquatting claim would be specious.

"'The paradigmatic harm that the [Anticybersquatting Consumer Protection Act] was enacted to eradicate' is 'the practice of cybersquatters registering several hundred domain names in an effort to sell them to the legitimate holders of the mark'" or to the highest bidder. *Lamparello*, 420 F.3d at 318 (citation omitted). No such claim is or can be made here. Spector is not alleged to have acquired any site for such "blackmail" purpose. The domain names in question, truthaboutchucknorris.com and truthaboutchuck.com (as well as thetruthaboutchuck.com), are shorthand references to the Book. Plaintiff cannot argue that Spector had no legitimate reason to register the domain names, which link to a website that disclaims any affiliation with Norris or other celebrities. (Spector Dec. ¶ 25)[17]

While a necessary element of a cybersquatting claim is bad faith, Plaintiff has presented no facts to support such a claim. The statute lists nine factors to be considered in weighing whether bad faith is present, including, for example, the lawful noncommercial or fair use of the mark in a website under the domain name, or, conversely, offers to sell the domain name without having used it. 15 U.S.C. § 1125(d)(1)(B)(i). The legislation also specifically provides that bad faith intent shall not be found in any case in which the court determines that the person believed, and had reasonable grounds to believe, that the use of the domain name was a fair use or otherwise lawful. *Id*. at § 1125(d)(1)(B)(ii). Plaintiff, having failed even to address the safe harbor or any of the factors, cannot discharge his burden on the motion, and Spector's sworn declaration (¶ 25) negates any possibility that Plaintiff has discharged his burden.

---

[17]    While Norris's unreasonable delay in bringing this action is addressed in Part IV, *infra*, it is worth noting that Norris clearly knew of Spector's registration of these domain names *at least* four months before bringing this litigation. The search results for domain name truthaboutchucknorris.com attached to Exhibit 2 of Deborah Lodge's Declaration in Support of the Motion have a print date of August 14, 2007; *see also* Plaintiff's Rep. #(iii). (Ringel Dec. Ex. 7)

**D.    Norris Is Not Likely to Succeed on His Right of Publicity Claim (Count 6)**

Apparently seeking to apply both New York and Texas rights of publicity law (Complaint ¶ 86), Norris claims the Book violates his right of publicity.[18]  Plaintiff cannot establish a likelihood of success under either state's law.  Courts have applied such laws narrowly and warily, recognizing the substantial risk that the tort would otherwise improperly limit speech.  *Rogers*, 875 F.2d at 1003-4 ("[C]ourts delineating the right of publicity . . . have recognized the need to limit the right to accommodate First Amendment concerns."); *ETW*, 332 F.3d at 931 ("There is an inherent tension between the right of publicity and the right of freedom of expression under the First Amendment."); *Cardtoons*, 95 F.3d at 970 (the right of publicity lacks the "built-in mechanisms that serve to avoid First Amendment concerns" in trademark claims).  As the Second Circuit observed in *Rogers*, courts "citing their concern for free expression, have refused to extend the right of publicity to bar the use of a celebrity's name in the title and text of a fictional or semi-fictional book or movie."  875 F.2d at 1004 (affirming grant of summary judgment to defendant).  The Fifth Circuit, applying Texas law, has agreed.  *Matthews* v. *Wozencraft*, 15 F.3d 432, 439-40 (5th Cir. 1994) (holding that defendant was entitled to summary judgment "because of free speech" defenses and noting that "[t]he Texas Constitution grants broader protection to speech and press than does the United States Constitution").

In *Matthews*, the Fifth Circuit held that "[c]ourts long ago recognized that a celebrity's right of publicity does not preclude others from incorporating a person's name, features or biography in a literary work, motion picture, news or entertainment story.  Only the use of an individual's identity in advertising infringes on the persona."  *Matthews*, 15 F.3d at 439 (citations and internal quotation marks omitted).  These conditions are simply not met here where Plaintiff challenges a book and, to a lesser degree, a website.  As the Fifth Circuit held in *Matthews*, a book does not implicate plaintiff's name or likeness because "'likeness' does not include general inci-

---

[18]    On the present motion he urges that Texas law applies.  (PM 14)

dents from a person's life, especially when fictionalized," and "a name cannot be appropriated by reference to it in connection with the legitimate mention of public activities." *Id.* at 438-39.[19]

New York law is similar: works of fiction may incorporate and even focus entirely on an account (factual or fictional) of a celebrity without giving rise to violation of N.Y. Civ. Rights Law §§ 50 and 51.[20] *See Hicks* v. *Casablanca Records*, 464 F. Supp. 426, 433 (S.D.N.Y. 1978) ("the right of publicity does not attach here, where a fictionalized account of an event in the life of a public figure is depicted in a novel or a movie, and in such novel or movie it is evident to the public that the events so depicted are fictitious"); *Paulsen* v. *Personality Posters, Inc.*, 59 Misc. 2d 444, 450 (Sup. Ct. Spec. T. N.Y. Co. 1968).[21]

In short, whether Texas or New York governs, Defendants are free to refer in satiric fashion — or otherwise — to Norris in an expressive work without running afoul of the right of pub-

---

[19]  Plaintiff relies on *White* v. *Samsung Elecs. Am., Inc.*, 971 F.2d 1395 (9th Cir. 1992). (PM 21)  But whatever the continuing vitality of that case (*see ETW*, 332 F.3d at 932-33; and *Cardtoons*, 95 F.3d at 969, each considering and rejecting *White*), as a case dealing with the use of a celebrity's image in an ad for a traditional product (*e.g.*, electronic goods), it provides no guidance to the use of a celebrity's name or image in an expressive work. *See Hoffman* v. *Capital Cities/ABC, Inc.*, 255 F.3d 1180, 1185 (9th Cir. 2001).

[20]  Plaintiff seems to be fighting battles long since resolved, claiming that the work is unprotected because *it is not* a biography.  (PM 7, 15)  "[I]t does not matter whether the book is properly described as a biography, a fictional biography, or any other kind of literary work.  It is not for a court to pass on literary categories, or literary judgment.  It is enough that the book is a literary work and not simply a disguised commercial advertisement for the sale of goods or services." *Frosch*, 75 A.D.2d at 769. *See also New Era Publ'ns Int'l, APS* v. *Henry Holt and Co.*, 695 F. Supp. 1493, 1506 (S.D.N.Y. 1988) ("It is an uncomfortable role for courts to serve as literary critics, passing on whether a purported work of history, teaching or criticism is entitled to respect as such"), *aff'd* 873 F.2d 576 (2d Cir. 1989).

[21]  Plaintiff relies on a 1967 case for the proposition that the First Amendment does not protect a book that "violates Mr. Norris's rights and misleads the public." (PM 22) (citing *Spahn* v. *Julian Messner, Inc.*, 21 N.Y.2d 124 (1967)). *Spahn* was an early effort to root a false light privacy theory in Sections 50 and 51 and to reconcile such claim with the principles of *New York Times* v. *Sullivan*, and *Time, Inc.* v. *Hill*, 385 U.S. 374 (1966).  It dealt with a fictionalized biography that held itself out as true — not a humorous parody or satire which was described from the outset as containing "farcical" facts.  (*See* Mulligan Dec. ¶ 11.)  This Court has held "the *Spahn* holding should be . . . limited to its facts," which included "deliberate falsifications . . . which the reader might accept as true." *Hicks, supra*, 464 F. Supp. at 432.  Those circumstances are not present here.  (Indeed, even Plaintiff acknowledges the Book is *not* a "fictional account of Norris's life." (PM 7)

licity. Plaintiff cannot demonstrate a likelihood of success on this claim.[22]

### E. Norris Is Not Likely to Succeed on His Common Law Claims (Counts 8, 9)

Norris's New York common law claims for unfair competition and unjust enrichment amount to right of publicity claims because they seek recovery for the commercial appropriation of Norris's name, image and persona. New York courts have held that Sections 50 and 51 of the New York Civil Rights Law provide the exclusive remedy for right of publicity claims. *Stephano* v. *News Group Publ'ns, Inc.*, 64 N.Y.2d 174 (N.Y. 1984); *Grodin* v. *Liberty Cable*, 244 A.D.2d 153 (1st Dep't 1997); *Hampton* v. *Guare*, 195 A.D.2d 366 (1st Dep't 1993). As demonstrated above, Plaintiff's claims under Sections 50 and 51 are meritless.[23]

## IV. PLAINTIFF'S CLAIM FOR INJUNCTIVE RELIEF IS ALSO BARRED BY THE DOCTRINES OF ACQUIESCENCE, ESTOPPEL AND LACHES.

A request for the extraordinary equitable relief of a preliminary injunction requires that Plaintiff has comported himself in a fashion that warrants a court of equity to intervene on his behalf. *In re United States Lines, Inc.*, 318 F.3d 432, 437 (2d Cir. 2003) ("[I]t is well-established

---

[22]    While the thrust of Plaintiff's complaint and injunction papers is directed to the Book, which is undoubtedly an "expressive work," efforts to advertise the Book are protected as well. *See, e.g., Groden* v. *Random House, Inc.*, 61 F.3d 1045 (2d Cir. 1995) (use of photograph in advertisement for book not actionable); *Velez* v. *VV Publ'g Corp.*, 135 A.D.2d 47 (1st Dep't 1988) (use of a prior front page of newspaper, which contained picture of Plaintiff, to advertise said newspaper was not actionable). Texas law dictates a similar result, expressly authorizing the use of an individual's "name . . . photograph or likeness in (1) a play, book, film, radio program or television program . . . or (5) an advertisement or commercial announcement concerning a use under this subsection." (Tex. Prop. Code Ann. § 26.012) While the statute was designed to *extend* the right of publicity to representation of deceased celebrities, it reflects existing law in other respects. *See, e.g., Page* v. *Something Weird Video*, 960 F. Supp. 1438, 1444-45 (C.D. Cal. 1996).

[23]    The discussion of the law in this Part III makes plain that Plaintiff has not only failed to demonstrate a likelihood of success on the merits but also has failed to present "sufficiently serious questions going to the merits to make them a fair ground for litigation." *Lusk*, 475 F.3d at 485. Moreover, given the public interest in free expression and the balance of hardships (discussed in Part IV, p. 24-25) it is clear that Plaintiff cannot show that the "balance of hardship" "tips decidedly" towards him. This precludes relief under the "alternative test" of this Circuit's preliminary injunction standards. *See Cliffs Notes*, 886 F.2d at 497.

that a litigant who seeks equity must do equity."). Norris's conduct, to the contrary, precludes him from obtaining such intervention.

Norris has known about Spector's website and its parodic use of "Chuck Norris facts" for more than two years. Norris himself embraced the "Chuck Norris facts" phenomenon, appearing on several television shows, reading the facts for laughs. He filmed an ad for the soft drink Mountain Dew alluding to the phenomenon. And he chose to include Chuck Norris "facts" in a paid political announcement endorsing Mike Huckabee for the Republican nomination for the Presidency. (Ringel Dec. Ex. 10). Strikingly, Norris endorsed Huckabee on Oct. 21, 2007, just three days before Norris first complained to Defendants about the Book's impending publication. (*Id.* ¶ 12)

Norris acknowledges knowing about the Book, including its use of "mythical" Chuck Norris "facts," since May 18, 2007, one day after a description of the Book and an announcement of its impending publication was made available in the trade publication *Publisher's Lunch.* (Norris Rep. #(i); Mulligan Dec. ¶ 11) Amazon.com and other sites featured descriptions of the book and images of the cover beginning as early as July 31. (Mulligan Dec. ¶ 14) Plaintiff admits that he was aware of the cover art by Aug. 7, 2007. (Norris Rep. #(ii))

Yet Plaintiff did not raise any question about the Book (which was described as "humorous writing" and "satire" in the pre-publication descriptions appended to Plaintiff's October 24 letter) or the "facts" in general until shortly after Norris publicly endorsed Huckabee. Defendant Penguin responded to the October 24 letter within two days, flatly rejecting Norris's contentions and offering legal support for its view. (Ringel Dec. Ex. 3) The Book, which had been printed and bound before Norris's initial letter was received, was first distributed on Oct. 30, 2007, as part of the previously scheduled distribution process. (Mulligan Dec. ¶ 17) Plaintiff did nothing until November 16, when his lawyer wrote a second letter urging Penguin to reconsider its position. (Ringel Dec. Ex. 4) Penguin responded the same day, making clear that Penguin was proceeding. (Ringel Dec. Ex. 5) It was not for another five weeks, on Dec. 21, 2007, that Norris commenced

his lawsuit.  By then, the Book — the November "publication date" of which had been promi-
nently displayed on all the literature attached by Plaintiff to the October 24 letter — had long since
been nationally distributed.  Plaintiff has admitted *actual* knowledge of the Book seven months
before his initiation of this action; his request for equitable relief is tardy in the extreme.[24]

     Nor has Norris demonstrated that he will be irreparably harmed in the absence of an in-
junction.  The two portions of the Book he specifically focuses on, the preface and the acknowl-
edgment, have been revised.  He has offered no evidence suggesting actual or likely confusion.
(*See* Point III, A2, *supra).*  The only "evidence" he offers of alleged injury (apart from such failed
claims of consumer confusion) is the completely unsupported hypothesis that misappropriation
"*may* well alienate Mr. Norris's existing licensees and impair his relations with prospective licen-
sees and business opportunities."  (PM 9; emphasis added)  This rank speculation — without any
proof that this has or will happen — is simply insufficient to substantiate a claim for irreparable
harm.  "To demonstrate irreparable harm, plaintiff must . . . provide more than mere speculation
that there is a possibility that the party seeking the injunction may in some unproved way suffer
loss or damage."  *Parenting Unlimited Inc.* v. *Columbia Pictures Television, Inc.*, 743 F. Supp.
221, 224 (S.D.N.Y. 1990)  (citation and internal quotation marks omitted).

     Balanced against this, quite apart from the enormous weight of the public's interest in free

---

[24]    *Meeropol* v. *Nizer*, 361 F. Supp. 1063 (S.D.N.Y. 1973) (injunctive relief barred by laches where plain-
tiff had constructive knowledge of potential claims before or when book was published based on pre-
publication publicity, but did not bring suit until four months later); *Roberts* v. *Atlantic Recording
Corp.*, 892 F. Supp. 83 (S.D.N.Y. 1995) (denying TRO where plaintiff was aware by May 7, 1995 that
allegedly infringing work was being made and was aware by May 9 of a May 15 planned release date,
but waited until May 17 to bring suit); *Business Trends Analysts* v. *Freedonia Group, Inc.*, 650 F.
Supp. 1452, 1459 (S.D.N.Y. 1987) (denying motion for preliminary injunction where plaintiff received
a copy of the allegedly infringing work in October 1985 but did not sue until May 1986); *Tom Doherty
Assocs.* v. *Saban Entm't, Inc.*, 869 F. Supp. 1130, 1140-41 (S.D.N.Y. 1994) (laches barred publisher
who delayed nearly five months in bringing a breach of contract action against a licensor), *aff'd on
other grounds*, 60 F.3d 27 (2d Cir. 1995); *Le Cordon Bleu* v. *BPC Publ'g Ltd.*, 327 F. Supp. 267
(S.D.N.Y. 1971) (denying motion to preliminarily enjoin magazine distribution in part because of a
six-week delay between learning of potential claim and bringing suit).

expression, is the real impact on Defendants of the relief sought. As the Declaration of Patrick Mulligan makes clear, the recall sought by Plaintiff would, as a matter of economic reality, result in the destruction of all copies of the Book since the costs of the recall and any post-injunction re-distribution would far exceed any possible ultimate proceeds.

On these facts, Plaintiff cannot invoke the aid of a court of equity even if his claims other-wise had merit. Whether viewed as acquiescence in or benefiting from the very conduct he now chooses to condemn, or laches for having slept on his rights, Plaintiff cannot be allowed to cause such harm to Defendants. In light of the meritlessness of Plaintiff's claims and the tardiness of his objections, it is unreasonable to shift the balance of hardships to Defendants. It would also be in-consistent with any concept of protection for free expression to do so. Plaintiff is not entitled to injunctive relief.

## CONCLUSION

For the foregoing reasons, this Court should deny Plaintiff's motion for a preliminary in-junction.

Dated: February 19, 2008
    New York, New York

               Respectfully submitted,

               CAHILL GORDON & REINDEL LLP

               By: _____

                  Dean Ringel
                  Gail Johnston
                  Andrea Butler
                  80 Pine Street
                  New York, NY 10005
                  (212) 701-3000 (phone)
                  (212) 269-5420 (fax)

                  Defendants Penguin Group (USA) Inc.,
                  Ian Spector, and QubeFactor, Inc.